*427
 
 Mr. Justice FIELD,
 

 after stating the case, delivered the opinion of the court, as follows:
 

 Neither of the patentees were living at the time the patent for the donation claim in this case was issued, Lownsdale having died in May, 1862, and Nancy having died in April, 1854. At common law the patent would have been inoperative and void from this circumstance.
 
 *
 
 By that law the grant to a deceased party is as ineffectual to pass the title of the grantor as if made to a fictitious person ; and the rule would apply equally to grants of the government as to grants of individuals, but for the act of Congress of May 20th, 1836,
 
 †
 
 which obviates this result. That act declares: “ that in all cases where patents for public lands have been or may hereafter be issued, in pursuance of any law of the United States, to a person who has died, or who shall hereafter die, before the date of such patent, the title to the land designated therein, shall enure to, and become vested in, the heirs, devisees, and assigns of such deceased patentee, as if the patent had issued to the deceased person during life.” This act makes the title enure in a manner different from that provided by the Donation Act upon the death of either owner before the issue of the patent, for we do not understand that the survivor of the deceased husband or wife was at the time his or her heir by any law of Oregon. If the act of 1836 can be considered as applying to patents issued under the Donation Act, where the party originally entitled to the patent has died before the patent issues—and on this, point no question is made by either party—then its language must be construed in connection with, and be limited by, the provisions of the Donation Act, giving the property of a deceased husband or wife to the survivor and children, or heirs of the deceased, unless otherwise disposed of by will; and in that case the patent here must be held to enure in favor of these parties instead of tbe heirs solely.
 

 
 *428
 
 The four children of Nancy Lownsdale, the two by her first husband, Gillihan, and the two by her last husband, survived her, and these, with her surviving husband, became entitled, on her death, to her property in equal proportions, she having died intestate. This is, indeed, the express language of the statute, and in consequence each of the five persons named took an undivided fifth interest in the property. The learned counsel of the appellant, however, contends that the statute should be construed as dividing the property equally between the survivor on the one part, and the children or heirs upon the other. But the construction we give is the more natural one, and is in accordance with the uniform ruling of the courts, State and Federal, in Oregon.
 

 In January, 1860, Lownsdale purchased the interest in this property of Isabella Gillihan (then Isabella Potter, she having intermarried with William Potter), and thus became owner of two undivided fifths. On his death these two undivided fifths passed to his heirs, he having died intestate, unless they were controlled by his covenant in the deed to Chapman.
 

 In 1864 a suit was brought in a Circuit Court of the State of Oregon, by one of the children of Nancy by her first husband, for partition of the property which was assigned to her of the donation claim—the Nancy Lownsdale tract as it is termed. In that suit the heirs of both Daniel and Nancy, and numerous other persons, purchasers and occupants under Daniel and the appellant, Davenport, were made parties. The suit resulted in a decree setting off, so far as practicable, the two undivided interests of Daniel to his heirs and vendees in lots and blocks as they were claimed, without any determination, however, of the extent of the respective rights and interests of these heirs and vendees between themselves; and in setting apart the remaining undivided three-fifths in severalty to the children of Nancy who had retained their interests, owelty being allowed and paid for the inequalities existing in the partition. The tract set apart for the two-fifths of Lownsdale included the prem
 
 *429
 
 ises in- controversy. The heirs of Lownsdale were his two children living by his first wife, two children of a deceased daughter by his first- wife, named Emma S. Lamb and Ida Squires, and his two children by his second wife. Against these heirs the only claimant of the premises in controversy was the appellant, Davenport, who derived his interest by various mesne conveyances from Chapman.
 

 The present suit is brought by the children of the deceased daughter of Lownsdale by his first wife, they having inherited her interest.
 

 Eor its determination it is necessary to consider the effect upon the interest claimed by Davenport of the covenants contained in the deed of Lownsdale, Coffin, and Chapman, executed to Chapman on the 25th of June, 1850.
 

 So far as that instrument purports to be a conveyance from Chapman to himself, it is of course ineffectual for any purpose. Its execution by him left his interest precisely as it existed previously. But this superfluous insertion of his name in the deed as a grantor, does not impair the efficacy of the instrument as a conveyance to him from Lownsdale' and Coffin, nor their covenants with him and his heirs and assigns. These covenants must be treated as the joint contracts of the two actual grantors.
 

 Whether these covenants bind the heirs of the covenantors, they not being named, may perhaps admit of question.
 
 *
 
 The court below held that to the extent that the covenants afiected the land, the heirs were bound by them, and as they have not appealed from this decision, it is unnecessary for the disposition of the case that the question should be determined by us.
 

 What, then, is the effect and operation of the covenants? The first covenant, as already stated, is
 
 “to toarrani and defend”
 
 the property released to Chapman, his heirs and assigns
 
 “against all
 
 claims,
 
 the United States excepted.”
 
 At the time this covenant was executed the title to the property was in the United States, and this fact was well known to
 
 *430
 
 the parties. Land was then occupied by settlers throughout the Territory of Oregon, under laws of the provisional government, which were generally respected and enforced. These laws could of course only confer a possessory right, and no one pretended to acquire any greater interest under them. It was against the assertion of claims from this source and any other source, except the United States, the owner of the fee, that the covenant in question was directed. By it the grantors were precluded from asserting any interest in the premises against the grantee and his heirs and assigns, unless such interest were acquired from the United States. The warranty does not cover that interest, and did not preclude its acquisition by the covenantors or either of them, or by their heirs, or its enjoyment by them or either of them when acquired.
 

 The second covenant is that if the grantors
 
 “ obtain the fee simple”
 
 to the property
 
 “from the government of the United States, they will convey the same”
 
 to the grantee, his heirs or assigns, “
 
 by deed of general ivarranty.”
 
 This covenant is special and limited. It takes effect only in case the grantors, or their heirs (if the covenant binds the heirs), acquire the title directly from the United States; it does not cover the acquisition of the title of the United States from any intermediate party, and this was evidently the intention of the parties. They expected to obtain by the legislation of Congress the title of the United States to lands in their possession, and in case their expectations in this respect were realized, they contracted to convey the same to their grantee, or to his heirs or assigns. They could not have intended, in case their expectations were disappointed, and the title passed from the United States to other parties, to render it impossible for them to acquire that title in all future time from those parties without being under obligation to instantly transfer it to the grantee or his successors in interest.
 
 *
 
 And such would be the effect of their covenant if it were given an operation beyond the precise limitation specified.
 

 
 *431
 
 As already stated, Lownsdale took under the Donation Act, as the survivor of his deceased wife, one undivided fifth interest in her property, and he subsequently purchased a similar interest from Isabella Gillihan, a daughter of his wife by her first husband. The interest which he thus purchased is not covered by the covenant. He did not acquire it directly from the United States. Whether the interest which he received as survivor of his deceased wife, Nancy Lownsdale, is within the covenant depends upon the question whether he took that interest by descent, as heir of Nancy, or directly as donee from the United States. The court below held that he took as donee, and not as heir, and that in consequence the interest was within the operation of the covenant, and Davenport, his assignee, was entitled to have such interest transferred to him, and that interest was accordingly set apart in severalty to him.
 

 Whether this ruling is correct it is unnecessary for us to determine. The appellant does not of course controvert it, and the heirs of Lownsdale, who alone could in this case question its correctness, have not appealed from the decree of the court below.
 

 The parol evidence offered of an alleged contract, in 1860, on the part of Lownsdale with Davenport, to confirm the title of the latter to the whole of block G, and of Lownsdale’s declarations at that time as to the title, is entirely insufficient to create any estoppel
 
 in pais
 
 against the assertion of the interest claimed by his heirs to portions of that property. The alleged contract of Lownsdale was simply to confirm the title of Davenport to all lands to which he, Lownsdale, deemed tbe title
 
 doubtful;
 
 and the ground of complaint appears to be that he did not consider the title of Davenport to block G as doubtful, and so declared, and therefore did not include that block in the property covered by his confirmatory deed. The declarations are at best but the expression of his opiniou in relation to a subject upon Avhich Davenport Avas equally well informed, or possessed equally with him the means of information. If the evidence of such declarati >us could be received years after the death of the
 
 *432
 
 party who is alleged to have made them, to control the legal title which has descended to his heirs,, a new source of insecurity in the tenure of property would be created, and heirs would often hold their possessions upon the uncertain testimony of interested parties, which it would be difficult and sometimes impossible to meet or explain after an interval of years, instead of holding them upon the sure foundations of the records of the country.
 
 *
 

 The decree of the court below must be
 

 Affirmed.
 

 *
 

 Galt v. Galloway,
 
 4
 
 Peters, 345; McDonald v. Smalley, 6 Id. 201; Galloway v. Finley, 12 Id. 298; McCracken’s Heirs v. Beall and Bowman, 3 A. K. Marshall, 210; Thomas v. Wyatt, 25 Missouri, 26.
 

 †
 

 5 Stat. at Large, 31.
 

 *
 

 Rawle on Covenants of Title, 579; Lloyd
 
 v.
 
 Thursby, 9 Modern, 463; Morse
 
 v.
 
 Aldrich, 24 Pickering, 450.
 

 *
 

 Comstock
 
 v.
 
 Smith, 13 Pickering, 116.
 

 *
 

 Biddle Boggs
 
 v.
 
 The Merced Mining Co., 14 California, 367.