## KINDRED *v.* UNION PACIFIC RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 51. Argued November 9, 1911.—Decided June 10, 1912.

Under § 2 of the act of July 1, 1862, 12 Stat. 489, c. 120, and other provisions of that act, the predecessor in title of the Union Pacific Railroad Company acquired a right of way four hundred feet in

width across the lands in Kansas, within the Delaware Diminished Indian Reservation, those lands having been assigned in severalty to individual Delawares under the treaty of May 30, 1860, 12 Stat. 1129, providing for such right of way.

*Quœre.* Whether the individual Delaware Indians, to whom the lands were assigned under the treaty of 1860, obtained a better or different right in them than the tribe had in the lands in common.

*Quœre.* Whether under § 2 of the act of July, 1862, the United States, in extinguishing the Indian title to lands through which the railroads were given rights of way, is to bear the burden by compensating the Indians, or only by assisting in the negotiations.

While the phrase "public lands" is a term ordinarily used to designate lands subject to sale under general laws, it is sometimes used in a larger sense, and as used in § 2 of the act of July, 1862, it includes lands within Indian reservations. Congress so intended and such has been the construction placed on the words by the Interior Department.

Where an Executive Department has constantly given the same construction to a statute affecting title to real estate, rights acquired thereunder will not be lightly disturbed after a lapse of many years.

Purchasers of land, over which a railroad has been constructed and operated, cannot claim that they purchased without notice of the claim of the railroad to own the right of way.

Where a railroad company enters upon the land of another and constructs a railroad thereover, under a statute entitling it to do so on condition that compensation be made to the owner, and the latter permits the construction and operation of the railroad without compliance with that condition, a subsequent vendee of the owner takes the land subject to the burden of the right of way, and the right to exact payment therefor from the railroad company belongs to the owner at the time of entry and construction.

168 Fed. Rep. 648, affirmed.

THE facts, which involve the right of the Union Pacific Railroad Company to certain portions of its right of way within the Delaware Diminished Reservation, are stated in the opinion.

*Mr. Edward D. Osborn,* with whom *Mr. A. M. Harvey* and *Mr. Frank Doster* were on the brief, for appellants:

Congress had no power to grant a right of way through

the lands in question. See treaty proclaimed March 24, 1831, 7 Stat. 357; treaty of 1854, 10 Stat. 1048; treaty of 1860, 12 Stat. 1129.

The design of the treaty of 1854, as accomplished by the treaty of 1860, was to vest the individual Delawares with a property right in the lands allotted to them in severalty. The quality of descendibility to successors was imparted to the land. There was, as in all land treaties with Indians, an understood, even if unexpressed, intent to educate the Indians into the habits of civilized life by individual ownership instead of communal occupancy. A full equitable title to the allotted lands became vested in the individual Delawares. *Jones* v. *Meehan,* 175 U. S. 1; *Francis* v. *Francis,* 203 U. S. 233.

Where a grant is made to one "and his heirs" a restriction on alienation either partial or entire does not debase the grant to a mere right of occupancy, but a vested interest passes thereby under the cover and protection of the constitutional guaranties of property right. *Libby* v. *Clark,* 118 U. S. 250; *United States* v. *Paine Lumber Co.,* 206 U. S. 467; *S. C.,* 154 Fed. Rep. 263; *United States* v. *Cook,* 19 Wall. 591; *Shiver* v. *United States,* 159 U. S. 491.

As an Indian allottee's interest in the land is a vested property right, Congress is lacking the power to make a grant through it of a railroad right-of-way without making provision for compensation therefor. *Jones* v. *Meehan,* 175 U. S. 1; *Cherokee Nation* v. *Southern Kansas R. R. Co.,* 135 U. S. 641.

The act does not purport or intend to grant a right-of-way through the lands in question, but only "through the public lands." At the time of its enactment the lands involved were not public lands nor were they merely lands conceded and guaranteed to the Indians as a perpetual home by express treaty; they had but a few months before been allotted in severalty to the individual members of the tribe. The question is not, "Could Congress grant

the right-of-way over these lands?", but "Did Congress do so?".

Congressional grants of land are not to be regarded as including lands which have been reserved or appropriated by the United States for any purpose whatever, even though they be not expressly excepted by the language of the grant. *L. L. & G. R. Co. v. United States*, 92 U. S. 733; *M., K. & T. Ry. Co. v. United States*, 92 U. S. 760; *Beecher v. Wetherly*, 95 U. S. 717; *Spokane Falls & N. Ry. Co. v. Ziegler*, 61 Fed. Rep. 392; *United States v. Sioux City Ry. Co.*, 46 Fed. Rep. 502; *Scott v. Carew*, 196 U. S. 100.

Grants of lands or rights out of the "public lands" are to be construed as excluding lands otherwise reserved or appropriated, unless a contrary intent is clearly and positively expressed. *Wilcox v. Jackson*, 13 Pet. 498; *Bardon v. Nor. Pac. R. Co.*, 145 U. S. 535; *Northern Lumber Co. v. O'Brien*, 71 C. C. A. 598; 139 Fed. Rep. 614, affirmed, 204 U. S. 190.

To give the act of July 1, 1862, the effect contended for by the appellee is to abrogate the treaty of 1860 with the Delaware Nation. A treaty of the United States, whether made with a foreign nation or with an Indian tribe, has the force of law equally with an act of Congress. Congress may abrogate such treaties, as it may repeal statutes, but in neither case is repeal or abrogation by implication favored. Unless the intent of Congress to abrogate the treaty is clear and undoubted from the language of the act, unless it admits of no other reasonable construction, it will not be construed as abrogating the treaty. *Chew Heong v. United States*, 112 U. S. 536; *United States v. Gue Sim*, 176 U. S. 459; *Ward v. Race Horse*, 163 U. S. 459; *Cope v. Cope*, 137 U. S. 682; *Turner v. American Missionary Union*, 5 McLean, 349.

The courts of the United States have uniformly held that grants of public lands to railways do not apply to Indian reservations, even though such reservations be not .

expressly excepted from the grant. *L. L. & G. R. Co.* v. *United States*, 92 U. S. 733; *Bardon* v. *Nor. Pac. R. Co.*, 145 U. S. 535; *Northern Lumber Co.* v. *O'Brien*, 204 U. S. 190; *Minnesota* v. *Hitchcock*, 185 U. S. 373; *A. & P. R. Co.* v. *Mingus*, 165 U. S. 413; *King* v. *McAndrews*, 111 Fed. Rep. 860; *United States* v. *Oregon Military Road Co.*, 103 Fed. Rep. 549, 554; *Nor. Pac. R. Co.* v. *Maclay*, 61 Fed. Rep. 554. *M., K. & T. Ry. Co.* v. *Roberts*, 152 U. S. 114, is not in conflict with this doctrine.

This rule of construction applies to right-of-way grants. *Washington & I. R. Co.* v. *Osborn*, 160 U. S. 103; *Union Pac. R. Co.* v. *Harris*, 215 U. S. 386.

Appellee's authorities do not support its contention that a different rule of construction is applicable to right-of-way grants. See *Railroad Co.* v. *Jones*, 177 U. S. 125; *Bybee* v. *Oregon Ry. Co.*, 26 Fed. Rep. 586.

The extinguishment clause is not an adequate expression of the intent of Congress to deprive the Indians of a part of the land that had been set apart and granted for their separate perpetual use, and to give it to the railroad company. *Atl. & Pac. R. Co.* v. *Mingus*, 165 U. S. 413.

The generally accepted construction put upon such extinguishment clauses is that its effect is to extend the grant to wild, unceded Indian lands occupied by the Indians under their original right of occupancy, but not to lands expressly reserved for their occupation or use by treaty. *Buttz* v. *Nor. Pac. R. Co.*, 119 U. S. 55; *Caldwell* v. *Robinson*, 59 Fed. Rep. 653; *L. L. & G. R. Co.* v. *United States*, 92 U. S. 733; *Nor. Pac. R. Co.* v. *Hinchman*, 53 Fed. Rep. 523.

This is the settled ruling of the Department of the Interior as to the similar extinguishment clause in the Northern Pacific grant. *Dillone* v. *Nor. Pac. R. R. Co.*, 16 Land Dec. 229; *Nor. Pac. R. Co.* v. *Warren*, 28 *Id.* 494; *Warren* v. *Nor. Pac. R. Co.*, 22 *Id.* 568; *Nor. Pac. R. Co.* v. *Eberhard*, 19 *Id.* 532; *Nor. Pac. R. Co.* v. *Haynes,*

20 *Id.* 90; *Nor. Pac. R. Co.* v. *Maclay*, 26 *Id.* 43; *Nor. Pac. R. Co.* v. *Clark*, 5 *Id.* 138; *Whitney* v. *Nor. Pac. R. Co.*, 1 *Id.* 343; *Phelps* v. *Nor. Pac. R. Co.*, 1 *Id.* 368; *William P. Maclay*, 2 *Id.* 675; *Atl. & Pac. R. Co.*, 13 *Id.* 373; *Atl. & Pac. R. Co.* v. *Tiernan*, 17 *Id.* 587.

The construction given to a statute by those charged with its execution has much weight and ought not to be overruled without cogent reasons. The decisions of the Department of the Interior in regard to the construction and effect of statutes relating to congressional grants of the public domain, especially when followed consistently for many years, will be accepted by the courts as correct, unless obviously wrong. *United States* v. *Hammers*, 221 U. S. 220; *United States* v. *Moore*, 95 U. S. 760; *Edwards* v. *Darby*, 12 Wheat. 206; *United States* v. *Burlington R. R. Co.*, 98 U. S. 334; *Brown* v. *United States*, 113 U. S. 568; *Hewitt* v. *Schultz*, 180 U. S. 139; *St. Paul, &c. R. Co.* v. *Phelps*, 137 U. S. 528; *Hastings, &c. R. Co.* v. *Whitney*, 132 U. S. 357; *McFadden* v. *Mountain View Min. Co.*, 97 Fed. Rep. 670.

The predecessors in title of the appellee accepted the benefits of the act of July 1, 1862, and thereby became subject to its limitations, as well those upon the original grant of July 1, 1862, as those upon the grants contained in the amendatory act itself. See *Humbird* v. *Avery*, 195 U. S. 480; *Heydenfeldt* v. *Davey G. & S. Mining Co.*, 93 U. S. 634.

By accepting an additional grant of powers or franchises, a corporation becomes subject to new restrictions imposed by the granting act. *St. Paul Ry. Co.* v. *Chadwick*, 6 Land Dec. 128; *St. Paul R. Co.* v. *Moling*, 7 *Id.* 184; *St. Paul R. Co.* v. *Thompson*, 10 *Id.* 507.

By "Government reservation" is obviously meant any public land reserved by the Government for any special use. Indian reservations are undoubtedly included within the meaning of the term. *Leavenworth, L. & G. R. Co.* v.

*United States*, 92 U. S. 733; *Hot Springs Cases (Rector v. United States)*, 92 U. S. 698; *A. & P. R. Co.* v. *Mingus*, 165 U. S. 413; *Cohn* v. *Barnes*, 5 Fed. Rep. 326, 331; *Rio Verde Canal Co.*, 27 Land Dec. 421.

*Mr. Maxwell Evarts* for appellee:

At the time of the Pacific Railroad Act of July 1, 1862, the Delaware Indians were the wards of the Nation and had only a right of occupancy to the lands in the Delaware Reservation, and such lands were at the time public lands of the United States within the meaning of the second and ninth sections of said act of 1862.

Moreover, the policy of the General Government has always been that the United States, and the United States alone, should have dealings with the Indians—its wards. Neither the railroads nor individuals were permitted to extinguish, by purchase or in any other way, any right of occupancy which the Indians might have in the lands of the United States. For this reason, therefore, such lands must be deemed to be public lands, so far as the people of the United States are concerned, with the right in the Government alone to extinguish the Indian title whenever such lands were necessary for purposes other than the occupancy thereof by the Indians. *Johnson* v. *M'Intosh*, 8 Wheat. 543, 585; *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17; *Jones* v. *Meehan*, 175 U. S. 1, 8.

The expression "Indian title" is perhaps misleading, and was not intended to convey the idea that the Indians had title to their lands in the usual meaning of the term, but only a right to live on them, subject to whatever disposition the United States might see fit to make of them. *Veale* v. *Maynes*, 23 Kansas, 1, 23; *Cherokee Nation* v. *Georgia*, 5 Pet. 1.

To understand the peculiar relations of the United States and of the Indians to the wild lands of the country, the treaties with the Delawares must be considered. See

treaties of January 21, 1785, 7 Stat. 16, 17; of January 9, 1789, 7 Stat. 28, 29; of 1795, 7 Stat. 49; of September 29, 1817, 7 Stat. 160; of September 17, 1818, 7 Stat. 178; of October 3, 1818, 7 Stat. 188; of September 24, 1829, 7 Stat. 327; May 6, 1854, 10 Stat. 1048; May 30, 1860, 12 Stat. 1129.

The treaties in *Veale* v. *Maynes*, (23 Kansas) with the Pottawatomie Indians were substantially the same as the treaties with the Delaware Indians, and the question then before Mr. Justice Brewer was precisely the question which is now presented to this court.

The Pottawatomie Treaty of 1867, 15 Stat. 531, is practically similar to the Delaware Treaty of 1866, 14 Stat. 793.

Mr. Justice Brewer held that the allotment of the land to the Pottawatomie Indians under the Treaty of 1861 made no change in the relation of the Indians of that Tribe to the land in controversy, except that the land instead of being held in tribal occupancy was to be held in personal or individual occupancy, and that no enlargement of the right of the Indians to occupy the land was to be found until the right to a patent in fee simple was given to them under the treaty of 1867.

The argument of Mr. Justice Brewer in the *Veale Case* is precisely the argument of appellees, that the Delaware Indians had no other, further or greater right to their lands by reason of the Treaty of 1860 than they had before.

The treaties with the Delaware Tribe show that up to the time of the Pacific Railroad Act of 1862 the Delawares had no claim whatever to the land in question except a right of occupancy at the will of the United States. See Ninth Article, Treaty of July 4, 1866, 14 Stat. 793, 796.

The question, however, of the right of the Leavenworth Company and its successors to the right of way across the lands of the Delawares is no longer open for determination

under the language of the treaties, but has long since be-
come an established rule of property in the State of Kan-
sas, under the decisions of its highest court. *Grinter* v.
*Kan. Pac. Ry. Co.*, 23 Kansas, 642; *State* v. *Horn*, 34
Kansas, 556; *S. C.*, 35 Kansas, 717; *Union Pacific Ry. Co.*
v. *Kindred*, 43 Kansas, 134, 135.

The Indians to whom the allotments were made under
the treaty of 1860, 12 Stat. 1129, have already been paid
for the right of way granted to the Leavenworth Company
and they and their successors in title have no claim of any
kind to the lands in question. See Art. 3 of Delaware
Treaty of 1860; act of July 1, 1862, *supra;* act of July 13,
1892, 27 Stat. 120, 126; *United States* v. *Un. Pac. Ry. Co.*,
84 Fed. Rep. 1022; *United States* v. *Un. Pac. Ry. Co.*, 168
U. S. 505.

No right of way by adverse possession has been ac-
quired by the appellants or any of them to any portion
of the right of way granted to the Leavenworth Company
under the act of July 1, 1862.

Congress alone was the judge of the width of the right
of way required by the grantee corporation. *Nor. Pac.
R. R. Co.* v. *Smith*, 171 U. S. 260, 275; *Nor. Pac. Ry. Co.*
v. *Townsend*, 190 U. S. 267, 272.

Equity has jurisdiction to protect a railroad company
in the use and enjoyment of its right of way. *Louis. &
Nash. R. Co.* v. *Smith*, 128 Fed. Rep. 1; *Cairo, V. & C. Ry.
Co.* v. *Brevoort*, 62 Fed. Rep. 129; *Pennsylvania R. R. Co.*
v. *Freeport Borough*, 138 Pa. St. 91.

MR. JUSTICE VAN DEVANTER delivered the opinion of
the court.

The ultimate question to be decided on this appeal is,
whether the appellee, the Union Pacific Railroad Com-
pany, has a right of way 400 feet in width across certain
lands in the State of Kansas, formerly within the Delaware

Diminished Indian Reservation.   The facts out of which
the question arises are these:

By the treaty of 1829, 7 Stat. 327, with the Delaware
Indians it was provided that certain lands in the fork of
the Kansas and Missouri rivers should be "conveyed and
forever secured" to those Indians "as their permanent
residence."   By the treaty of May 6, 1854, 10 Stat. 1048,
parts of the reservation so established were relinquished
and the remainder retained for a "permanent home."
Article 11 of this treaty declared that at the request of the
Delawares the diminished reservation should be surveyed
and each person or family assigned such portion as the
principal men of the tribe should designate, the assign-
ments to be uniform; and Art. 12 provided that railroad
companies, when their lines of railroad necessarily passed
through the diminished reservation, should have a right
of way on payment of a just compensation.   The treaty
of May 30, 1860, 12 Stat. 1129, after reciting such a re-
quest as was contemplated by the preceding treaty, pro-
vided that 80 acres of the diminished reservation should
be assigned and set apart for the exclusive use and benefit
of each Delaware and his heirs; that the tracts assigned
should not be alienable in fee, leased or otherwise disposed
of, except to the United States or to other members of the
tribe, and should be exempt from levy, taxation, sale or
forfeiture until otherwise provided by Congress; and that
if any Delaware should abandon the tract assigned to
him the Secretary of the Interior should take such action
in respect of its disposition as in his judgment might seem
proper.   Article 3 of this treaty gave to the Leavenworth,
Pawnee & Western Railroad Company, a Kansas cor-
poration, a preferred right to purchase the unassigned
lands in the reservation, and declared: "It is also agreed
that the said railroad company shall have the perpetual
right of way over any portion of the lands allotted to the
Delawares in severalty, on the payment of a just compen-

sation therefor, in money, to the respective parties whose lands are crossed by the line of railroad."

The act of July 1, 1862, 12 Stat. 489, c. 120, relating to the location, construction and maintenance of the Union Pacific and other railroads, authorized the Leavenworth, Pawnee & Western Railroad Company, before mentioned, to locate, construct and maintain a railroad from the Missouri river, at the mouth of the Kansas river in Kansas, to a connection with the Union Pacific Railroad on the 100th meridian of longitude in Nebraska, and granted to it, as also to other companies named in the act, a right of way in the following terms:

"SEC. 2. That the right of way through the public lands be, and the same is hereby, granted to said company for the construction of said railroad and telegraph line; and the right, power, and authority is hereby given to said company to take from the public lands adjacent to the line of said road, earth, stone, timber and other materials for the construction thereof; said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, and depots, machine shops, switches, side tracks, turntables, and water stations.    The United States shall extinguish as rapidly as may be the Indian titles to all lands falling under the operation of this act and required for the said right of way and grants hereinafter made."

Other portions of the act required the Leavenworth, Pawnee & Western Railroad Company to file with the Secretary of the Interior within six months after the date of the act an acceptance of its conditions and within two years after such date a map of the general route of its road, and to complete 100 miles, commencing at the mouth of the Kansas river, within two years after such acceptance, and 100 miles per year thereafter until completion; and made provision for an official examination and approval

of the completed road in sections of 40 consecutive miles. The company seasonably filed an acceptance of the conditions of the act and a map of the general route of its road showing that the route extended from the mouth of the Kansas river to and across the Delaware Diminished Reservation. That part of the road was constructed on that route and put into operation within two years from the date of the act, and was duly examined and approved by the proper officers of the United States. Under congressional authority the route for the remaining part of the road was subsequently changed so that the connection with the Union Pacific Railroad would be made at a point farther west than was originally intended, and the later construction conformed to this change, but this has no bearing here. The appellee, the Union Pacific Railroad Company, became in 1898, and now is, the successor in interest and title of the Leavenworth, Pawnee & Western Railroad Company.

By the treaty of July 4, 1866, 14 Stat. 793, provision was made for the removal of the Delawares from their home on the diminished reservation to lands secured for them in the Indian Territory, and for the sale by the United States of the lands in the reservation, whether held in common or assigned in severalty, with the qualification that assignees electing to dissolve their tribal relations and become citizens of the United States might retain the tracts assigned to them and ultimately receive patents in fee simple with power of alienation. On receiving payment for the lands sold the United States was to issue patents therefor to the purchaser or his assigns, and apply the proceeds to the benefit of the tribe or the assignees, depending upon whether the particular lands were held in common or had been assigned in severalty. The intended removal was effected, the reservation was extinguished, and the lands therein, including most of those assigned in severalty, were sold as intended.

The lands through which the asserted right of way here in controversy extends were within the diminished reservation at the date of the act of 1862, had then been assigned in severalty to individual Delawares under the treaty of 1860, were sold by the United States under the treaty of 1866, and are now claimed by the appellants through mesne conveyances under the patents issued to the purchaser at that sale. The railroad was located and constructed across these lands without the payment of any compensation for the right of way. But, so far as appears, no attempt was made by the tribe, the individual assignees, or the United States to prevent the location and construction, and no controversy arose between them and the railroad company, save as there was a dispute as to whether the assignees were entitled to compensation, and, if so, as to who should pay it. See *Grintner* v. *Kansas Pacific Railway Co.*, 23 Kansas, 642; Id. 659; *United States* v. *Union Pacific Railway Co.*, 168 U. S. 505. In 1892 Congress recognized the right of the assignees to be compensated for the right of way, and made an appropriation to pay them, accompanying it with a direction to the Attorney General to institute proceedings against the railroad company to compel it to reimburse the Government. See 27 Stat. 120, 126, c. 164; *United States* v. *Union Pacific Railway Co., supra.*

The Circuit Court and the Circuit Court of Appeals sustained the railroad company's claim to a right of way 400 feet in width, 168 Fed. Rep. 648, and the present owners of the tracts affected prosecute this appeal.

It was contended in the courts below, and the contention is repeated here, that the individual Indians to whom the lands were assigned in severalty obtained no better or different right in them than the tribe had in the lands held in common; in other words, that the right was one of possession or occupancy only, the United States remaining the real proprietor and having full power to terminate the

Indian right at will. But, without passing upon that contention, we think it may well be assumed for the purposes of this case that the assignees, although not possessing the legal title and not promised a conveyance of it, had something more than the ordinary right of possession or occupancy of tribal Indians in lands set apart for tribal use. We say this, because the right of the assignees, whatever it may have been, was acquired and held under the treaty of 1860, wherein it was agreed that the Leavenworth, Pawnee & Western Railroad Company should have a perpetual right of way over any of the lands assigned in severalty, on the payment of a just compensation to those whose lands were crossed by its railroad. It therefore is not as if Congress had undertaken to grant a right of way through these lands without either the assent of the assignees or any provision for compensating them. As respects these lands, the right-of-way section in the act of 1862 did not stand alone, but was to be taken in connection with the treaty provision. The two, together, meant that the right of way was granted, not merely by the United States, but with the assent of the Indian assignees, and that the latter were to be justly compensated. The only uncertainty, if any, introduced into the situation arose from the presence in the right-of-way section of the promise on the part of the United States that it would as rapidly as might be extinguish the Indian title to all lands required for the right of way. This seems to have given rise to a question, whether the United States was to bear the burden of extinguishing the title, as by compensating the Indians therefor, or only to assist in obtaining it, as by conducting negotiations with the Indians in respect of the compensation to be paid to them. But we are not here concerned with that question, because the right under the treaty to have the compensation seasonably ascertained and paid by whomsoever was liable therefor was not insisted upon. No steps to that end

were taken, but, on the contrary, the construction of the railroad was permitted to proceed and the road was completed and put into operation as a public highway at least three years before the lands were sold under the treaty of 1866.

But it is said that the right-of-way section was inapplicable because it was confined to "public lands," a term used to designate such lands as are subject to sale or other disposal under general laws. No doubt such is its ordinary meaning, but it sometimes is used in a larger and different sense. We think that is the case here, first, because the provision in the same section, that the United States should extinguish as rapidly as might be the Indian title to all lands required for the right of way, implies that Indian lands as to which Congress properly could grant a right of way were intended to be included, and, second, because the section was so interpreted by the Executive Department charged with the administration of the act, as also of affairs pertaining to the Indians and public lands, and rights acquired thereunder ought not lightly to be disturbed after the lapse of so many years.

It results that the sole irregularity in respect of the acquisition of the right of way contemplated by the treaty provision and the statute, taken together, was the failure to make compensation therefor to the Indian assignees when the railroad was constructed or until after the lands had been sold for their benefit to the remote grantor of the appellants. The railroad was in existence and being operated across the land at the time of the sale, as ever since, and therefore there can be no claim that that or any subsequent purchase was made without notice of the right of way.

So, if the appellants be regarded as claiming under the Indian assignees, which is the most favorable view for the appellants, the case still falls within the general rule, that where a railroad company enters upon the land of another

and constructs a railroad thereover under a statute entitling it so to do on condition that compensation be made to the owner, and the latter permits the road to be constructed and put into operation without a compliance with that condition, a subsequent vendee of the owner takes the land subject to the burden of the right of way, and the right to exact payment therefor from the railroad company belongs to the owner at the time the company entered and constructed the road.  *Roberts* v. *Northern Pacific Railroad Co.*, 158 U. S. 1, and cases cited.

At an early stage of the case it appears to have been contended that the appellants acquired title to parts of the right of way by adverse possession, but as the contention is expressly abandoned in the brief, evidently in view of the ruling in *Northern Pacific Railroad Co.* v. *Smith*, 171 U. S. 260; *Northern Pacific Railway Co.* v. *Townsend*, 190 U. S. 267, and *Northern Pacific Railway Co.* v. *Ely*, 197 U. S. 1, it need not be considered.

We conclude that the decree of the Circuit Court of Appeals was right.

*Decree affirmed.*