Charles D. Sauer, Overland Park, Kan., Keith Wilson, Jr., Independence, Mo., F. Browning Pipestem, Norman, Okl., Alvin D. Shapiro, Patrick Woodley, Kansas City, Mo., for plaintiff.

The **ABSENTEE SHAWNEE TRIBE OF INDIANS OF OKLAHOMA, Daniel Little Axe, Governor, Plaintiff,**

v.

The **STATE OF KANSAS, Defendant.**

**Civ. A. No. 84-2435-S.**

United States District Court, D. Kansas.

Nov. 12, 1985.

John W. Campbell, Asst. Atty. Gen., Topeka, Kan., for defendant.

MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendant's motion for partial summary judgment. Oral argument was held on July 19, 1985. This dispute centers around a land patent dated April 19, 1865, which plaintiff claims is void on its face.

The uncontroverted facts for the purposes of this motion are as follows. The land in question comprises 11.97 acres located in Johnson County, Kansas, and is known as the Shawnee Mission State Park. This land was originally contained within three sections of land patented to the Reverend Thomas Johnson and his heirs. Defendant traces its title to this land to a land patent dated April 18, 1865.

Due to the nature of this case, some historical background is helpful. Reverend Thomas Johnson served as a Methodist missionary to the Shawnee Indians in Kansas for twenty-six years. In 1830, Reverend Johnson opened a Methodist mission

and school in what today is known as Wyandotte County, Kansas. In 1838, Reverend Thomas received a letter from C.A. Harris, Commissioner for Indian Affairs, which stated the United States Government agreed to cooperate with the Missionary Society of the Methodist Episcopal Church in the construction and operation of an Indian manual labor school. In 1839, Reverend Johnson was appointed superintendent of the Indian Mission District which encompassed the Shawnee Indians in Kansas. Also in 1839, the Shawnee Methodist Mission and Indian Manual Labor School were opened for classes. The school was located in what is today known as Johnson County, Kansas.

In 1844, the Methodist Episcopal Church separated over the issue of slavery. The Shawnee Methodist Mission and Indian Manual Labor School fell within the boundary of the Methodist Episcopal Church South. Reverend Johnson was superintendent of the Indian Manual Labor School.

On March 5, 1853, the United States Congress authorized the President to enter into negotiations with the Indian tribes west of Missouri and Iowa to secure settlement and to extinguish Indian title to the land. In the spring of 1854, a Shawnee tribal delegation began negotiations with the Commissioner of Indian Affairs. The parties agreed upon a treaty with amendments on May 10, 1854. This treaty was ratified by the Senate on August 2, 1854, was approved by the Shawnee Indians in full council on September 28, 1854, and proclaimed by the President on November 2, 1854. Pertinent provisions of this treaty provide as follows:

Article 1. The Shawnee tribe of Indians hereby cede and convey to the United States, all the tract of country lying west of the State of Missouri, which was designated and set apart for the Shawnees in fulfillment of, and pursuant to, the second and third articles of a convention made between William Clark, Superintendent of Indian Affairs, and the chiefs and headmen of the Shawnee nation of Indians, at St. Louis, on the seventh day of November, one thousand eight hundred and twenty-five, which said tract was conveyed to said tribe, (subject to the right secured by the second article of the treaty made at Wapaghkoneta, on the eighth day of August, one thousand eight hundred and thirty-one,) by John Tyler, President of the United States, by deed bearing date the eleventh day of May, one thousand eight hundred and forty-four—

Article 2. The two hundred thousand acres of land reserved by the Shawnees, shall be selected between the Missouri State line, and a line parallel thereto, and west of the same, thirty miles distant; which parallel line shall be drawn from the Kansas River, to the southern boundary line of the country herein ceded; ... Of the lands lying east of the parallel line aforesaid, there shall first be set apart to the Missionary Society of the Methodist Episcopal Church South, to include the improvements of the Indian Manual Labor School, three sections of land; ... All the land selected, as herein provided, west of said parallel line, and that set apart to the respective societies for schools, and to the churches before named, shall be considered as part of the two hundred thousand acres reserved by the Shawnees.

\*   \*   \*   \*   \*   \*

... After all the Shawnees, and other persons herein provided for, shall have received their shares of the two hundred thousand acres of land reserved, it is anticipated that there will still be a residue; ... It is agreed that all the tracts of land, in this article assigned, or provided to be assigned or selected, shall be assigned and selected according to the legal subdivisions of United States lands, and according to the laws of the United States respecting the entry of public lands, so far as said laws are applicable; and no portion of this instrument shall be so construed as to nullify or impair this stipulation. And the said Indians hereby cede, relinquish, and convey to the United States, all tracts or parcels of land

which may be sold, or are required to be sold in pursuance of any article of this instrument.

\* \* \* \* \* \*

Article 6. The grants of land above made to missionary societies and churches, shall be subject to these conditions: The grant to the Missionary Society of the Methodist Episcopal Church South, at the Indian Manual Labor School, shall be confirmed to said Society, or to such person or persons as may be designated by it, by patent, from the President of the United States, upon the allowance to the Shawnees, by said society, of ten thousand dollars, to be applied to the education of their youth; which it has agreed to make. The grants for the schools established by the Baptists and Friends, shall be held by their respective Boards of Missions, so long as those schools shall be kept by them,—when no longer used for such purpose by said Boards, the lands, with the improvements, shall, under the direction of the President, be sold at public sale, to the highest bidder, upon such terms as he may prescribe, the proceeds to be applied by the Shawnees to such general beneficial and charitable purposes as they may wish: *Provided*, That the improvements shall be valued, and the valuation deducted from the proceeds of sale, and returned to said Boards respectively.

10 Stat. 1053.

In 1855, the Commissioner of Indian Affairs, on behalf of the Shawnee Indians, reached an agreement with the Missionary Society of the Methodist Episcopal Church South. The Society agreed to board and educate up to eighty (80) Shawnee children at the Fort Leavenworth Manual Labor School which would be known as the Shawnee Manual Labor School. The Commissioner agreed to pay a per annum in quarterly payments of Five Thousand Dollars ($5,000) in money and to credit the Society with One Thousand Dollars ($1,000) per annum up to Ten Thousand Dollars ($10,-000), which the Missionary Society had agreed to pay for the land pursuant to the

1854 treaty. If the school were closed prior to the full ten-year period, the unliquidated balance of the $10,000 was to be adjusted between the parties upon principles of right and equity. The effective date of this agreement was October 1, 1854.

In 1856, an agreement was reached by the Missionary Society of the Methodist Episcopal Church South and Reverend Johnson whereby the Society gave Reverend Johnson one of the three sections of land the Society had received pursuant to the 1854 treaty. A second section of land was given to Reverend Johnson in return for which he was to assume the Society's $10,000 obligation to the government. The Society reserved the remaining section of land containing the school buildings. In 1857, the Secretary of the Interior approved the designation of land by the Missionary Society and Reverend Johnson, which included all of the Southwest Quarter of Section Three, Township Twelve, Range 25 East of the 6th Principal Meridian, which is the subject matter of this litigation. Also in 1857, those lands not selected by individual members of the Shawnee Nation or withheld on behalf of the Absentee Tribe of the Shawnee Indians were thrown open for purchase and redemption. In 1861, the Missionary Society conveyed its remaining interest in the southwest quarter of section three to Reverend Johnson, thus bringing the total quarter section under his equitable title.

In 1862, Reverend Johnson was informed that the government was annuling its contract with the Missionary Society. The school had been functioning from October 1, 1854, to September 30, 1862. The government had paid the Society Thirty-Two Thousand Five Hundred Dollars ($32,-500), leaving a balance of Seven Thousand Five Hundred Dollars ($7,500). The Society, however, still owed Two Thousand Dollars ($2,000) on the $10,000 for the reservation of the land. Deducting this from the balance due would leave Five Thousand Five Hundred Dollars ($5,500) to be paid by the government.

Reverend Thomas Johnson was murdered on January 2, 1865. On April 3, 1865, the Secretary of the Interior approved the payment of $5,500 to the Administrator of Reverend Johnson's estate. On April 6, 1865, a land patent was issued for three sections of land due Johnson under the 1854 treaty. On April 18, 1865, the President approved and signed a land patent which provided, in pertinent part:

... whereby it appears that the "Rev'd. Thomas Johnson, now deceased, was designated by said society as the person to whom the Patent for said three sections of land should issue under the provisions of the 6th Article of said treaty." And the Secretary of the Interior under date April 7th, 1865, has decided that the Patent should be issued to the said Thomas Johnson, the selection constituting the said three sections having been made in subdivisional tracts ...

(Exhibit A attached to defendant's motion for partial summary judgment.) The land patent was filed on May 26, 1865.

Defendant seeks partial summary judgment on the issue of the validity of the April 18, 1865, land patent. Plaintiff alleges that the land patent is null and void on its face because it purports to convey property to Thomas Johnson and his heirs when Thomas Johnson was already deceased.

To rule favorably on a motion for summary judgment, the court must first determine that the matters considered in connection with the motion disclose "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The principal inquiry is therefore whether a genuine issue of material fact exists. *Dalke v. The Upjohn Co.*, 555 F.2d 245 (9th Cir.1977); *Hanke v. Global Van Lines, Inc.*, 533 F.2d 396 (8th Cir.1976). A motion under Rule 56 will be denied unless the movant demonstrates beyond doubt that he is entitled to a favorable ruling. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir.1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d

33 (10th Cir.1975). Pleadings and documentary evidence are to be construed liberally in favor of a party opposing a Rule 56 motion. *Harman v. Diversified Medical Investments Corp.*, 488 F.2d 111 (10th Cir.1973), *cert. denied* 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). However, once a summary judgment motion has been properly supported, the opposing party may not rest on the allegations of the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Coleman v. Darden*, 595 F.2d 533, 536 (10th Cir.), *cert. denied* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). A party with evidence tending to create a factual issue must present that evidence to the trial judge or summary judgment is proper. *Otteson v. United States*, 622 F.2d 516, 520 (10th Cir. 1980).

Defendant argues that the patent was issued in conformity with the 1854 treaty and further that the patent was issued in conformity with the law respecting entry on public land in effect at the time the patent was issued. From 1836 to 1976, a statute was in effect which provided:

Where patents for public lands have been or may be issued in pursuance of any law of the United States to a person who has died before the date of such patent, the title to land designated therein shall inure to and become vested in the heirs, devisees and assignees of such deceased patentee as if the patent had issued to the deceased person during life.

(See 1964 Ed., 43 U.S.C. 1152, repealed by P.L. 94–579.) Plaintiff asserts that this statute is inapplicable because the land in issue is Indian land rather than public land.

█ It is clear that at common law a land patent to a party already deceased is void. *Davenport v. Lamb*, 13 Wall. 418, 80 U.S. 418, 20 L.Ed. 655 (1871). Defendant asserts that pursuant to the provisions of 43 U.S.C. 1152, Reverend Johnson's heirs could take title to this land. The Circuit Court for the Western District of Washington, in *Meeker v. Kaelin*, 173 F. 216 (W.D.Wash.1909), found that lands con-

tained within an Indian reservation were not public lands and therefore the statutory provision vesting title in the heirs of a deceased patentee was inapplicable. The court, however, did not elaborate on this finding.

Section 1152, Title 43, United States Code, was later discussed in *Larkin v. Paugh,* 276 U.S. 431, 48 S.Ct. 366, 72 L.Ed. 640 (1928). In that case, Lewis Greyhair, a Winnebago Indian, received a trust patent in 1902. In 1916, he made application for issuance of a fee simple patent. Greyhair died on April 30, 1916, and the patent was issued on May 19, 1916, over two weeks after his death. The court found that the patent was valid under the provisions of 43 U.S.C. 1152. The court found the statute to be valid for Indian selections made under Indian treaty as well as for patents for Indian allotments made under an Act of Congress. The court noted that the term "public lands" is seldom considered to include lands selected for or allotted to Indians but is sometimes used to include such lands where the United States has retained the title. The court found the statute to be highly remedial and concluded that patents to Indians were encompassed within its scope.

In *Crews v. Burcham,* 1 Black 352, 66 U.S. 352, 17 L.Ed. 91 (1861), the Pottawatomie Indians ceded their lands, subject to certain reservations for which patents were to be issued. Francis Besion, a member of the tribe, was a reservee of one-half section of land under an 1832 treaty. Besion died in 1843. A land patent was issued in 1845. The court found the act of Congress, on May 20, 1836, (5 U.S.St. 31) the predecessor of 43 U.S.C. 1152, to be applicable and upheld a prior conveyance of the land by Besion. Likewise, in *United States v. Chase,* 245 U.S. 89, 38 S.Ct. 24, 62 L.Ed. 169 (1917), the United States Supreme Court upheld a patent selecting an allotment for Reuben Wolf, an Omaha Indian, who died before the issuance of the patent in his name.

▪ In the instant case, plaintiff asserts that the statute is inapplicable because this case involves Indian land, rather than public land. "Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians." *Solem v. Bartlett,* 465 U.S. 463, 468, 104 S.Ct. 1161, 1165, 79 L.Ed.2d 443 (1984). Indian country may also include lands held in fee by non-Indians within reservation boundaries. *Id.*

In the 1854 treaty in this case, the Shawnee Indians ceded to the United States 1.6 million acres of land. The United States in return ceded to the Shawnee Indians two hundred thousand (200,000) acres of land located in what today is known as Kansas. The land in question herein is contained within these 200,000 acres.

The treaty provided for individual Shawnee Indians to claim a specific amount of land based on the family household. Second, specific amounts of land contiguous in nature could be selected by certain bands of the Shawnee tribe. Grants of land were also made to missionary societies and to a federal agency. Any surplus land not selected by individual Indians or by a particular band could be sold by the federal government. In certain circumstances, some missionary lands could become surplus lands to be sold by the federal government.

Article 2 of the treaty specifies that land set apart for schools and churches is to be considered as part of the 200,000 acres reserved by the Shawnees. However, Article 2 further states: "And the said Indians hereby cede, relinquish, and convey to the United States, all tracts or parcels of land which may be sold, or are required to be sold in pursuance of any article of this instrument."

Article 6 of the treaty discusses the grants of land to the missionary societies and churches. The grant to the Baptists and the Friends was to be held by their respective Boards of Missions as long as

they maintained schools, and when no longer used for such purposes, the land, with improvements, would be sold at public sale. The grant to the Missionary Society of the Methodist Episcopal Church South was to be confirmed to the Society "or to such person or persons as may be designated by it, by patent, from the President of the United States, upon the allowance to the Shawnees, by said society, of ten thousand dollars ..."

By the terms of Article 6, the land to the missionary societies was land which eventually would be sold and was therefore ceded back to the United States by the Indians under the terms of the treaty. The title to this land remained in the United States until it was to be sold; in the case of the missionary society, upon the payment of $10,000. Since the United States retained title to this land, it may be considered as public land for the purposes of 43 U.S.C. 1152. See *Larkin v. Paugh, supra.* The court makes this finding even when considering the general rule that "doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation ..." *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977), *quoting McClanahan v. Arizona State Tax Comm'n.,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). The status of the land in question is made clear by the treaty.

Further, "public lands" is a term usually used to designate such lands as are subject to sale or other disposal under general laws. *Kindred v. Union Pacific R.R. Co.,* 225 U.S. 582, 32 S.Ct. 780, 56 L.Ed. 1216 (1912). This term, however, may be used in a larger sense to include lands within Indian reservations. *Id.* Considering the remedial purposes of 43 U.S.C. 1152 and the nature of the land in question, the land patent can be found to fall within the statute's scope and is therefore deemed valid.

IT IS BY THE COURT THEREFORE ORDERED that defendant's motion for partial summary judgment is hereby granted.