EASTERN OREGON LAND CO. v. DESCHUTES R. CO.

DESCHUTES R. CO. v. EASTERN OREGON LAND CO.

(Circuit Court of Appeals, Ninth Circuit.	October 1, 1917.)

No. 2814.

1. PUBLIC LANDS ⬚79—RAILROAD LAND GRANTS—PRIORITIES.

Where S. in February, 1906, filed his application to select certain lands as forest reserve lieu lands, which applications were never dismissed or withdrawn until patents were issued in 1913, though the land was temporarily withdrawn from entry in the meantime, the rights of S. under such patents were superior to the right of a railroad whose profile under Act March 3, 1875, c. 152, 18 Stat. 482 (Comp. St. 1916, §§ 4921–4926), granting rights of way through the public lands, was filed in 1908 and approved in 1910.

2. RAILROADS ⬚64(2)—GRANTS OF RIGHTS OF WAY—EVIDENCE.

In a suit to restrain the construction of a railroad in which defendant alleged an agreement with complainant's predecessors in interest and asked that if the bill was not dismissed the court determine the amount of damages sustained, evidence held to show that complainant's predecessors in interest did not undertake to bind complainant, who then had an option to purchase the land, by their agreement as to the right of way.

3. RAILROADS ⬚64(2)—GRANTS OF RIGHTS OF WAY—EVIDENCE.

In such suit, evidence held to show that it was a condition of the agreement between complainant's predecessor and defendant and of complainant's acquiescence therein that the railroad should be constructed at such a grade as to permit complainant to build a dam approximately 60 feet high, and that on the building of such dam it would be defendant's duty to protect its own roadway from injury by the water stored by the dam by riprapping or building a retaining wall.

4. RAILROADS ⬚64(1)—AGREEMENTS AS TO RIGHTS OF WAY—DUTY OF PARTIES.

Under an agreement that a railroad company might build its road across certain land at such a height as to permit the landowner to build a dam on condition that the company would protect its own roadway by riprapping or building a retaining wall, it was the landowner's implied duty in building the dam to use every reasonable precaution by the construction of a spillway or other engineering device to carry off flood waters.

5. RAILROADS ⬚64(1)—AGREEMENTS AS TO RIGHTS OF WAY—DUTY OF PARTIES.

Under L. O. L. §§ 6552, 6553, authorizing persons, companies, and corporations having title or possessory right to land to use and enjoy the water of any running stream to furnish electrical power and to condemn lands for sites for reservoirs for the storage of water, where the landowner had authority thereunder to acquire lands above the dam not owned by it at the time of the agreement for its reservoir and its water storage purposes, it would be defendant's duty to perform the same duties respecting its roadway through such lands subsequently acquired by complainant, as it undertook to perform respecting the lands owned by complainant.

⬚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. EMINENT DOMAIN ⬤�península316—COSTS—PERSONS LIABLE.**

Where, in a suit to restrain the construction of a railroad, the answer asked the court, in case the bill was not dismissed, to determine the amount of damages to which complainant might be entitled, and no tender or offer to pay damages had been made prior to suit, the costs were properly imposed upon defendant as on the complainant in a condemnation suit; the answer having been framed in part as a suit for equitable condemnation.

Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit by the Eastern Oregon Land Company against the Deschutes Railroad Company. From the decree (213 Fed. 897), both parties appeal. Reversed and remanded with directions.

In equity. Suit to restrain defendant railroad company from constructing, maintaining, or operating a railroad over certain lands owned by the complainant. From a decree restraining complainant from interfering with the maintenance and operation of the railroad over the lands in suit, and awarding complainant damages in the sum of $1,000 as compensation for the value of a 200-foot right of way through certain of its lands, and costs taxed at $513.22, both parties appeal.

This controversy arises out of conflicting claims by the Eastern Oregon Land Company (hereinafter designated as the "complainant") and the Deschutes Railroad Company (hereinafter designated as the "defendant") to reservoir and water storage rights claimed by the complainant in the Deschutes river and along its banks and rights of way claimed by the defendant over and across certain lands owned by the complainant and through which flows the Deschutes river in Oregon. The lands are located, and for convenience of reference they may be classified as follows:

(a) North half of the southwest quarter (N. ½ of the S. W. ¼) of section 35, township 3 south, range 14 east, Willamette meridian; lot 2 (N. W. ¼ of the N. E. ¼) of section 3, township 4 south, range 14 east, Willamette meridian.

(b) Southeast quarter (S. E. ¼) of section 34, township 3 south, range 14 east, Willamette meridian; southwest quarter of the northeast quarter (S. W. ¼ of the N. E. ¼), west half of the southeast quarter (W. ½ of the S. E. ¼), and east half of the southwest quarter (E. ½ of the S. W. ¼) of section 3; northwest quarter (N. W. ¼), and northwest quarter of the southwest quarter (N. W. ¼ of the S. W. ¼) of section 10, all in township 4 south, range 14 east, Willamette meridian.

(c) Lot 1 (N. E. ¼ of the N. E. ¼) of section 3; northeast quarter of the southeast quarter (N. E. ¼ of the S. E. ¼) of section 9, all in township 4 south, range 14 east, Willamette meridian.

There are certain other lands mentioned in the complaint which, it has been found, the line of the defendant's railroad does not cross or touch, and are, therefore, not involved in this appeal. These lands are described as follows:

(d) West half of the southwest quarter (W. ½ of the S. W. ¼) of section 27, township 3 south, range 14 east, Willamette meridian; southeast quarter of the northwest quarter (S. E. ¼ of the N. W. ¼) of section 3; northwest quarter of the southeast quarter (N. W. ¼ of the S. E. ¼), northeast quarter of the southwest quarter (N. E. ¼ of the S. W. ¼), and northwest quarter of the southwest quarter (N. W. ¼ of the S. W. ¼) of section 9; northeast quarter of the southeast quarter (N. E. ¼ of the S. E. ¼) of section 8, all in township 4 south, range 14 east, Willamette meridian.

The complainant sued to enjoin and restrain the defendant from constructing and maintaining its railroad along the Deschutes river over and across complainant's lands described above. The original complaint was filed April 18, 1910; the amended complaint, November 12, 1913. At the time the original complaint was filed the defendant was engaged in the construction of its

road through complainant's lands and had its grade practically completed. The road was located and the work of construction commenced while the land was claimed by complainant's predecessors in interest. These predecessors, so far as they are material to this controversy, were one J. H. Sherar, claiming the lands described in the preceding clauses (a) and (b) of this statement, and the Interior Development Company, claiming the lands described in the preceding clause (c), together with water power rights in the Deschutes river.

The Deschutes river flows through these lands in a deep gorge or canyon, and by reason of falls therein, the quantity of water, the uniformity of flow, and the steep and precipitous banks, the site is valuable for power purposes, provided (it is claimed by the complainant) a 60-foot dam, above ordinary low water in the river, can be maintained at the power site.

The defendant's road runs along the side of the canyon and has been constructed upon a grade at and above the power site, which complainant claims will not admit of a dam 60 feet in height in the river without flooding the fills and embankments of defendant's roadbed above such dam, and in times of high water endangering the road itself in that locality, unless the same is properly protected.

The further claim of the complainant is that the defendant entered into possession of its right of way under oral agreements or understandings with its predecessors in interest to locate its road so as to permit and protect the maintenance of a 60-foot dam, above ordinary low water in the river, but, as the road has been actually built, no such dam can be safely constructed, unless the defendant is required to protect its own roadway above the dam; and, as a consequence, the value of the water power is greatly impaired and damaged. It is alleged in complainant's complaint that the defendant has at all times known that the lands in suit are valuable chiefly because of the fact that the Deschutes river flows through them, and in its course through these lands the flow of the river is so great that it can be advantageously used for the development of power. The prayer of the complaint is that the defendant be enjoined and restrained from constructing, maintaining, building, or operating a railroad over the lands in suit, and from interfering with plaintiff's possession thereof.

The defendant's answer admits that complainant has the legal title to the lands described in the complaint, but it is claimed by the defendant that the complainant acquired its title to such lands after the defendant had entered upon such lands and partly constructed its grade; that defendant entered into possession of its right of way under an agreement with the executors of the estate of J. H. Sherar, B. F. Laughlin. and the Interior Development Company, the predecessors in interest of the complainant in such lands described, in which agreement it was provided that, if the road should be constructed as high as the same could be conveniently raised without making the expense prohibitive and without interfering with the proper and convenient operation of the line, the damage would be nominal; that Laughlin and the Interior Development Company at all times knew where the road was located, and at all times expressed approval of the height at which the line was proposed to be constructed and was being constructed, and never at any time objected to the defendant because of the height or manner in which said road was constructed or to the location thereof, until the line was practically completed across said lands. It is alleged in defendant's answer that it has acquired by purchase certain lands and the right of way over certain other lands for railroad purposes along the Deschutes river, above the lands owned by the complainant; that complainant has acquired no right to flow the waters of the river back upon any of the lands so acquired by the defendant or back or over or upon its right of way, or to raise the waters of the river above its natural flow; and the defendant charges that any dam which the complainant might construct across the Deschutes river, or the development of any power by the use of the waters of the Deschutes river by means of any such dam at or along or in the neighborhood of any of the lands described in the complainant's amended bill as belonging to the complainant, will result in the flooding and overflowing of the defendant's said lands so purchased for railway purposes. and will overflow the defendant's right of way, causing great and irreparable injury and damage to the defendant and its line of road.

The answer concludes with the prayer that the bill of complaint be dismissed; but, in case the court should adjudge that the defendant was not entitled to have the bill dismissed, then the court was asked to determine the amount of damages sustained by. the complainant or to which the complainant might be entitled by reason of the location and construction of defendant's line of road over and across the lands owned by the complainant, and that it be decreed that complainant shall make, execute, and deliver a good and sufficient deed therefor upon the payment by the defendant to the complainant of such sum as the court shall find.

Wirt Minor and Veazie, McCourt & Veazie, all of Portland, Or., and Charles S. Wheeler and John F. Bowie, both of San Francisco, Cal., for appellant.

A. C. Spencer, W. A. Robbins, and James G. Wilson, all of Portland Or., for appellee and cross-appellant.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above).   1. With respect to the lands described as the north half of the southwest quarter of section 35, township 3 south, range 14 east, Willamette meridian, and lot 2 (northwest quarter of the northeast quarter) of section 3, township 4 south, range 14 east, Willamette meridian, the decree of the lower court provides that:

"The title of complainant to said property was acquired subsequent to the acquirement of said right of way of defendant over said property, and the same is subject to such right of way, provided, however, that the right hereby decreed to defendant shall not be understood or considered to interfere with or deprive complainant or its successor in interest of the right to construct and maintain a dam for hydraulic purposes in the Deschutes river where it passes through such property. and installing in connection therewith appliances for the purpose of developing hydraulic and electric power for all purposes, provided the track or roadbed of defendant shall not thereby be flooded or damaged, or the operating of its road interfered with."

The first question to be determined is whether the title to the lands described in this part of the decree was acquired by the complainant prior to the defendant's claim of a right of way over such lands.   It appears that one Joseph H. Sherar as early as 1871 bought the possessory right of an occupant in certain public lands along the Deschutes river.   The land was not at that time surveyed.   After the public surveys were extended over that section of the country, Sherar made a homestead entry of the southeast quarter of section 34, township 3 south, range 14 east.   At the time he made such entry he supposed that it included the falls of the Deschutes river at that point, and not until 1901 did he discover that the south line of his homestead did not run south of the said falls.   He thereupon took steps to acquire title to the lands upon which the falls are situated, namely, lot 2 (northwest quarter of the northeast quarter) of section 3, township 4 south, range 14 east; and, in addition, the north half of the southwest quarter of section 35, township 3 south, range 14 east, and the southeast quarter of the northwest quarter of section 3, township 4 south, range 14 east. As the line of the defendant's railroad does not cross or touch the last-named tract of land in section 3, the title thereto is not involved in this appeal.

[1] It will not be necessary to enter into detail concerning the steps taken by Sherar to acquire title to these tracts of land. It is sufficient for the present purpose to say that on the 13th day of February, 1906, Sherar filed a contest and protest against the application of one A. L. Veazie on behalf of the Interior Development Company to select these lands under the act of Congress of June 4, 1897, as forest reserve lieu lands, with base in the name of the Santa Fé Pacific Railroad Company. Sherar's protest against the Veazie selection was on the ground that the lands were not at the time of the latter attempted selection vacant or unoccupied lands, but were in the possession of Sherar, who at that time, to wit, on the 13th day of February, 1906, presented and filed in the land office his application to select the same lands as forest reserve lieu lands under the Act of June 4, 1897, with base likewise in the name of the Santa Fé Pacific Railroad Company. These applications were prosecuted in the land office, were never dismissed or withdrawn, and Sherar continued to reside on the lands until his death in 1908. These selections by Sherar were finally approved by the Secretary of the Interior and ordered passed to patent on February 25, 1913, and on that day patents were issued thereon in the name of the Santa Fé Pacific Railroad Company for the use and benefit of the heirs and devisees of Joseph H. Sherar, who held the power of attorney from the Santa Fé Pacific Railroad Company to convey the selected lands. (Executors of J. H. Sherar v. A. L. Veazie, Attorney in fact for the Santa Fé Pacific R. R. Co., decision by Frank Pierce, First Assistant Secretary of the Interior, dated June 16, 1909. Not reported.)

These titles, evidenced by patents of the United States, were vested in the complainant at the time of the commencement of this suit. Upon the trial of the case it was stipulated that, prior to the issuance of patent by the United States for these lands to the Santa Fé Pacific Railroad Company for the use and benefit of the heirs and devisees of Sherar, the defendant had located and constructed its line of railroad over and across the said lands, claiming a right of way under the act of Congress approved March 3, 1875, entitled "An act granting to railroads the right of way through the public lands of the United States." This right of way (200 feet in width, being 100 feet on each side of the center line of the railroad track) is claimed by the defendant to have been acquired under that act by filing with the register of the land office at The Dalles, Or., on the 8th day of November, 1908, a profile of its road, and the approval of said profile by the Secretary of the Interior on the 20th day of June, 1910.

The right of way granted by the act was a right of way over public lands; not a right of way over private lands, or over possessory claims to the public lands. See section 3, Act of March 3, 1875, c. 152, 18 Stat. 482 (Comp. St. 1916, § 4923). It was the opinion of the court below that the subsequent approval of the prior application of the Santa Fé Pacific Railroad Company to select such lands in lieu of other lands under the Act of June 4, 1897, c. 2, 30 Stat. 36, did not relate back to the date of the application and supersede the rights of the defendant acquired by the approval of its map of definite location under the Act of March 3, 1875. This opinion was based upon the opinion of this court in Daniels v. Wagner, 205 Fed. 235, 125 C. C. A.

93; but that case was reversed in the Supreme Court on appeal (237 U. S. 547, 35 Sup. Ct. 740, 59 L. Ed. 1102, L. R. A. 1916A, 1116, Ann. Cas. 1917A, 40); the court holding that one who has done everything essential, exacted either by law or by the regulations of the land department, to obtain a right from the land office conferred upon him by Congress, cannot be deprived of that right, either by the exercise of discretion or by a wrong committed by the land officers. Under this decision the Sherar lieu land selections, being first in time, were first in right. Clarke v. Halverson, 45 L. D. 54.

It is further stipulated that on April 26, 1906, all the lands in township 3 south, range 14 east, excepting any tracts title to which had passed out of the United States, should be temporarily withdrawn from any form of disposition whatever. The withdrawal was for the purpose of constructing irrigation works under the Act of June 17, 1902, c. 1093, 32 Stat. 388 (Comp. St. 1916, §§ 4700–4708). And on October 24, 1908, a similar order was made in section 3 of township 4 south, range 14 east. When these withdrawals were made, the title to the Sherar lieu land selections had, by the doctrine of relation, passed out of the United States (Daniels v. Wagner, supra) and was in no way affected by the withdrawals.

It follows that a footnote to the Sherar patents, that the lands described were subject to all rights under an application of the Deschutes Railroad Company approved June 20, 1910, under the Act of March 3, 1875, for right of way, was ineffectual to convey to the Deschutes Railroad Company such right of way, as the title to the land had already vested in Sherar's heirs and devisees.

It is also stipulated that on December 30, 1909, and March 18, 1910, the lands embraced in the Sherar lieu land selections were included in the temporary power site withdrawals Nos. 66 and 125 by executive order of the President of the United States, stating that the same were "in aid of proposed legislation affecting the disposal of water power sites on the public domain." These withdrawals were canceled as to the lands included in the Sherar selections on February 25, 1913, in order to allow patents to issue upon said lieu selections. These withdrawals having been made subsequent to the Sherar selections, they in no way affected complainant's titles derived from the United States and based upon such selections.

The dam site owned by the complainant is located across the Deschutes river and, as appears from the map, in lot 2 (northwest quarter of the northeast quarter) of section 3.

We are of the opinion that the court below was in error in that part of its final decree where it holds:

"That the title of the complainant to said property was acquired subsequent to the acquirement of said right of way of defendant over said property and the same is subject to such right of way."

Under the law, as declared by the Supreme Court in Daniels v. Wagner, supra, the title of complainant to said property was acquired prior to the claim of the defendant to a right of way over the same, and the decree should have so provided.

We concur in part in the further holding of the court that what-

ever right the defendant has (a question to be considered later) "shall not be understood or considered to interfere with or deprive complainant or its successor in interest of the right to construct and maintain a dam for hydraulic purposes in the Deschutes river where it passes through such property and installing in connection therewith appliances for the purpose of developing hydraulic and electric power for all purposes," but we do not concur in the proviso that "the track or roadbed of defendant shall not thereby be flooded or damaged, or the operating of its road interfered with." The defendant having entered upon these lands without authority, except such as we shall refer to later, no conditions can be imposed upon the complainant to protect defendant's roadbed and embankments from the waters of the Deschutes river. That condition rests upon the defendant as a duty incident to the maintenance of its right of way.

[2] 2. With respect to the lands described as the southeast quarter of section 34, township 3 south, range 14 east, Willamette meridian; the southwest quarter of the northeast quarter, the west half of the southeast quarter, and the east half of the southwest quarter of section 3; and the northwest quarter and northwest quarter of the southwest quarter of section 10, all in township 4 south, range 14 east, Willamette meridian—it was admitted by the defendant in its answer that the complainant was the owner of such tracts of land and that the defendant had located its road over and across the same. The court below awarded to the complainant the sum of $1,000 as compensation for the right of way taken by the defendant across said lands, and, upon the payment of that sum by the defendant before the final decree, the court entered its decree in favor of the defendant as the owner of such right of way.

The original bill of complaint, filed April 18, 1910, alleged title in these and the other lands described, and prayed for an injunction restraining the defendants from entering upon and trespassing upon the same and from constructing or building a railroad over the same and from interfering with the possession of the complainant or its enjoyment of the lands, pending the determination of the suit. At that time the line of road had been graded through part of these lands, but no rails had been laid thereon. There is no evidence in the record as to the quantity of land occupied by the road or its value, but the defendant alleges that it agreed to pay the Sherar heirs $1,000 for the right of way in case the holder of the option (the complainant) did not purchase the land. The complainant did purchase, and, upon this evidence as to an alleged agreement with the executors of Sherar's estate, the court assumed that $1,000 was a reasonable compensation to be paid for the right of way; but the agreement was not in writing, and the evidence is clear that neither the executors of the Sherar estate nor their attorneys undertook to bind the complainant to this agreement. On the contrary, the attorneys for the executors of the Sherar estate, in a letter dated August 25, 1909, addressed to J. W. Morrow, representing the defendant, said:

"The executors (of the Sherar estate) understand that if the persons (the complainant) who have agreed to purchase do not take the property (includes the lands above described) that your company will pay one thousand dollars

for the right of way. *If the sale is consummated, as we assume it will be, then you are to settle with the purchasers for the right of way.*" Signed: Huntington & Wilson.

C. Monroe Grimes, one of the executors of the Sherar estate, testified that J. W. Morrow, representing the defendant company, came to him for the purpose of getting a right of way over the Sherar property and they went to Huntington's office and took it up with him; that Mr. Morrow was told:

"That if the Sherar estate did not negotiate a sale that was on at that time, that they should have the right of way to go through the property for one thousand dollars, *but in the event the sale was made they would have to make their terms with the other people (the complainant)*."

Mr. Morrow was further informed that the Eastern Oregon Land Company was the purchaser with whom the executors of the Sherar estate were negotiating.

The prayer of the defendant's answer was that the court should determine complainant's damages by reason of the location and construction of defendant's line of road over and across the lands owned by the complainant, in the event the court refused to dismiss complainant's bill. The court refused to dismiss complainant's bill, and thereupon fixed the value of the right of way at $1,000; but in the understanding or agreement between the parties this valuation was coupled with the condition that complainant should have the right to build a dam in the river 60 feet in height, and the defendant should take care of its right of way above this dam. The evidence upon this question will be discussed in the following paragraph of this opinion.

[3] 3. With respect to the lands described as lot 1 (northeast quarter of the northeast quarter) of section 3, and the northeast quarter of the southeast quarter of section 9, township 4 south, range 14 east, Willamette meridian, the controversy relates to an agreement or understanding between the predecessor in interest of the complainant and the defendant concerning the height of a dam complainant proposed to place in the Deschutes river for the purpose of developing hydraulic and electric power, and the elevation of defendant's railroad above the river so as to permit such a dam. This controversy is not, however, confined to the lands above described; it relates, either directly or indirectly, to all the lands involved in this appeal, and particularly to lot 2 (northwest quarter of the northeast quarter) of section 3, township 4 south, range 14 east, adjoining lot 1, above mentioned.

The conclusion of the court below, as expressed in its final decree, is that it was understood and agreed by the defendant and the Interior Development Company, the owner of the tracts of land above mentioned at the time of said agreement with the defendant, and at the time of the entry thereon and the construction thereover of defendant's line of railroad, *that the location of defendant's track should not interfere with or deprive the Interior Development Company or its successor in interest of the right to construct and maintain a dam in the Deschutes river where it flows through such property, for hydraulic purposes, and to install in connection therewith appliances for*

*the purpose of developing hydraulic and electric power for all pur-*
*poses.* In this conclusion we concur. We think this agreement or
understanding is fully supported by the evidence, and that the com-
plainant acquired all the lands involved in this appeal with this agree-
ment or understanding.

But the court adds a proviso to this conclusion, as follows:

"Provided, however, *that the track and roadbed of defendant should not
thereby be flooded or damaged or the operation of its road interfered with.*"

In other words, that whatever dam the complainant may build
must be constructed at the peril of causing injury to the fills and em-
bankments of the defendant's railroad and of being held responsible
therefor in damages, without any obligation or duty on the part of
the defendant to protect such fills and embankments and make them
reasonably secure against the water above such a dam.

We have failed to find any evidence in the record supporting this
clause of the decree with respect to these lands, or any of the lands
involved in this appeal. It was certainly not an agreement or under-
standing as stated by either of the parties, and we do not think it is
an inferable conclusion from anything that passed between them.

It appears from the evidence that the defendant ran a survey
through this property in October, 1908, for its line of road. This line
was located on the water grade along the river. It passed the dam
site on lot 2 of section 3, at an elevation of approximately 20 feet
above the low water in the river, and this elevation was maintained
along the river with some little variation until the line passed out
of plaintiff's lands, crossing the south line of the northeast quarter
of the southeast quarter of section 9, township 4 south, range 14
east, at an elevation of about 20 feet above the low water of the river.
In February or March, 1909, B. F. Laughlin, holding an option to
purchase the Sherar lands for a water power proposition, visited J. P.
O'Brien, the president of the Deschutes Railroad Company, at Port-
land, Or., for the purpose of obtaining information concerning the
location of the line of the Deschutes Railroad along the Deschutes
river through the Sherar lands. Laughlin testified that O'Brien told
him that he wanted the witness to get all the interested people to
agree upon a price for a right of way on the river, and at the same
time he guaranteed to protect the Sherar property to the fullest ex-
tent that it was possible. O'Brien called in Mr. Boschke, the chief engi-
neer of the road, and asked him how they had run their grade on the
river. Boschke replied that they had run it right along—a few feet
from water. O'Brien told Boschke he would have to go back and re-
run the line and save every foot of power for the Sherar property
that could be saved; that they had examined the property with their
engineer; and that they might have to buy it before they got through,
but to save every foot it was possible to save. Mr. Boschke remon-
strated, said he would have to go back 12 miles. O'Brien told him
it did not make any difference how far he had to go back; he must
do it.

Mr. O'Brien testified, concerning this conversation with Mr. Laugh-
lin, that the line of railroad had been located at that time. His recol-

lection was that there had been several surveys. One was on the grade close to the river, and there was another, his recollection was, 35 or 40 feet above the river. He said Laughlin asked him how high they could get up in the air at Sherar's. The witness said he did not know; that would be a question of cost. As a result of it, he sent for Mr. Boschke. He told Mr. Boschke to run a line there and see how far he could get up at Sherar's, without making the cost prohibitive. He asked Mr. Boschke if he had any idea, or if he could get any idea from the data he had in his possession at that time, as to how high he could go without making the cost prohibitive, and Boschke replied, "In the neighborhood of 58 or 60 feet." O'Brien asked Laughlin if that would be satisfactory at that height—along in there between 58 and 60 feet. Mr. Laughlin said he thought that would be satisfactory; that any height that they could go above where the line was laid at that time was going to help them out. O'Brien asked Laughlin about the right of way. Laughlin said he did not think there would be any question about the right of way; that he would be willing to give the right of way free. The witness told Mr. Boschke to make a survey so as to see how high he could get the line up there without the cost being prohibitive. His recollection was that they spent about $100,000 additional in constructing the line where it was afterward located, over and above the estimated cost of the line on the river grade. This additional expenditure, he said, was made to preserve the power site so they could operate it. It was simply a question of how far they could get up in order to give Laughlin the additional height, in order to develop his power.

Mr. Boschke, the chief engineer, testified, concerning this interview between Laughlin and O'Brien, that the line was then located on the water grade along the river. Laughlin wanted them to change the grade so as to enable them to build a power house at Sherar's Bridge. He did not remember exactly the height he thought he could make; it was 45 or 50—perhaps 60—feet. The whole thing hinged on starting up on a maximum grade and getting as high as they could. That was what his instructions were to do. His understanding was that, if the grade of the road was raised as high as it could be raised, the right of way would be given for a nominal sum, or something of that kind. The purpose was to put the road at such an elevation as to allow Laughlin to build as high a dam as possible.

A. Welch, the president of the Interior Development Company during 1908 and 1909, testified that he visited Mr. O'Brien in September, 1909, in company with Isaac Anderson. They went to find out how high the railroad would be at the Sherar Bridge. They were taken by Mr. O'Brien to Mr. Boschke's office, and the maps were shown and examined. The witness said:

"Then they asked about the right of way, and we told them that, if they would protect our filing, there would be no charges for the right of way. We specified the height of the dam as 60 feet, that we desired." They said they "had taken that into consideration. They showed us the maps of the railroad grades and heights, which showed, as I remember it, between 64 and 65 feet above low water. They had at that time already raised their levels to that height before we made a request for it."

Isaac W. Anderson testified, concerning this conversation with O'Brien:

"I went to see Mr. O'Brien in company with Mr. Welch. I cannot give the exact language of the conversation, of course. I can give you the general conversation. We were expecting to construct a water power plant there, and our talk with Mr. O'Brien was regarding the location of the road; it should be high enough to allow us to build, to put in those improvements, the required improvements, which included naturally a dam, and our plans were to build a dam 60 feet high. * * * We had the maps there and went over the maps with him, or with the engineer, and the understanding we had was that the line would be so located that a dam of that height could be built; and my recollection is Mr. O'Brien instructed, then and there, Mr. Boschke to so locate the line." Mr. O'Brien told Mr. Boschke "that the line should be built there, that we had the rights there, and they should be protected."

Mr. J. W. Morrow, the right of way agent for the Deschutes Railroad Company, was present at the conference between Mr. Laughlin and Mr. O'Brien. Mr. Laughlin was interested in having the railroad company elevate the grade of its road as far as possible, and something was said to Mr. Boschke as to what elevation they could get there, or to what elevation they could reach, and he got the impression and understood then that Mr. Boschke said he could reach an elevation of 60 feet, and with that elevation Mr. Laughlin was entirely satisfied. On August 9, 1909, Mr. Morrow called upon Mr. J. Monroe Grimes, the managing executor of the Sherar estate, to discuss the question of the right of way through the Sherar properties. Mr. Morrow testified that Mr. Grimes said that, so far as he was personally concerned, he would be very glad to donate the right of way; that the value of the property—its principal value—was as a power location, and that by the construction of the line of railroad it would enable them to develop the power plant; that, without it, it would be practically impossible to do so. He said, however, that in view of the fact that there were other heirs to the estate, and that they were widely separated, he could not reasonably satisfy them without some compensation, and they agreed that $1,000 should be paid for the right of way. They then went immediately to the office of Mr. Huntington, the attorney for Mr. Grimes, and the agreement was restated in his presence. Mr. Morrow testified further:

"I was told that some parties had an option on the property, and an understanding was had that, in case the sale was made, then I should have to deal, or I must deal, with the purchaser. * * * At that conference, and with that understanding, it was agreed that the elevation of the line should be such that a dam 60 feet in height above low-water mark should be constructed. I, undoubtedly, had my profile with me at that time. I cannot recall exactly, but in all probability I did. I wouldn't go to solicit the purchase of a piece of right of way without the profile and map showing the location of the property; that is, it is not customary to do it, and I presume that I had it."

The witness testified that he was advised of the outstanding option on the Sherar property, and that on August 24th he met Mr. Walter S. Martin, the president of the complainant corporation, on the train coming from Salem, and the witness then learned that he, or his company, the complainant, was the prospective purchaser. The witness testified:

"We went into the matter pretty thoroughly; in fact, I think I broached this subject to Mr. Martin, and it developed that he was the prospective purchaser; and I outlined to him the agreement that I· had reached with the Sherar estate representatives, and that agreement was entirely satisfactory to him. He said that we could go on and build the line, and, as a matter of fact, when the thousand dollar consideration was mentioned, Mr. Martin wasn't at all interested in that feature of it. I said to him, 'I have agreed to pay the Sherar estate a thousand dollars, and I will do the same thing by you.'

"To that Mr. Martin simply said that it was satisfactory. He was perfectly satisfied to have us go on and construct our line, and he was willing to carry out the agreement that I had had with the Sherar estate people."

On the next day Morrow wrote to Huntington & Wilson, attorneys for the Deschutes Railroad Company, as follows:

"Huntington & Wilson, Attorneys at Law, The Dalles, Oregon—Gentlemen: This will acknowledge receipt of your letter under date of August 25th confirming our conference and understanding over the contention with reference to the construction of our line through the Sherar's estate property, for which I thank you very much. And at the same time I am pleased to advise that I talked this matter over with Mr. Martin of the Eastern Oregon Land Company, who has expressed a willingness to have us go upon the land to construct our line."

This letter simply asserts that Martin had expressed a willingness to have the railroad company go upon the land and construct its line. It did not claim that Martin had consented to the railroad company constructing its line without regard to the terms that had been agreed upon concerning the protection of complainant's power plant, and there is nothing in the following correspondence upon this subject that gives to Mr. Martin's assent any waiver of such terms. Mr. Martin testified that the lands were required for hydroelectric possibilities, and, with respect to the interview with Mr. Morrow, he said:

"I remember that Mr. Morrow said that he thought the Deschutes river was an exceptional opportunity for the development of power and that we had a valuable property there. * * * What I said in reply to the thing (right of way) was that, if they do anything in regard to the right of way which damages the power value of that property, they do so at their own peril, and, if they damage that property from the point of view of its power possibilities, we will feel free to retire from our contract."

This evidence, taken in connection with all the surrounding circumstances and conditions, indicates that the agreement or understanding of the parties was that the railroad was to be raised so as to protect the power plant to be located upon the lands now owned by the complainant, and the defendant was to protect such power plant by taking care of its own right of way through such lands.

The railroad was constructed along the Deschutes river and through the lands involved in this appeal, upon a maximum grade of eight-tenths of 1 per cent. Upon this grade the road reached an elevation above the sea of 779.6 feet at a point designated on the map as the "Interior Dam Site." At this point the elevation of the river, in March, 1909, was 722.1 feet; making the elevation of the road above the river 57.5 feet. On April 3, 1910, the elevation of the river was 716.3 feet; the elevation of the road above the river being at that time 63.3 feet.

On August 31, 1910, the elevation of the river was 715.3 feet; the elevation of the road above the river being 64.3 feet. But it is plain from the testimony that, with the grade of the road as it has been constructed, a dam cannot be built at this point 60 feet in height above the river with safety to any interest connected with either the railroad or power plant properties without some method of protection on the part of the defendant; and we think the agreement to raise the elevation of the road to the grade to which it has been carried was coupled with the agreement to protect complainant's power plant by taking care of its own right of way through such lands. If this was not the agreement, then the raising of the grade by the defendant was useless and accomplished no purpose. Besides, it is obvious that the duty of the railroad company to take care of its own right of way is the usual and the only practical method of using such right of way to advantage.

Upon this question we have a practical demonstration of what the grade should have been, by a railroad constructed at the same time and under similar conditions, just across the river. At the same time the Deschutes Railroad was being built up the south bank of the river, the Oregon Trunk Line was engaged in building a railroad up the north bank of the river. The distance between the two roads at the dam site is 551 feet. As a result of the negotiations between complainant's predecessors in interest and the officers of that line of railroad for a right of way along the north bank of the river, that road constructed its grade at such an elevation that it passes the dam site at an elevation of 785.27 feet, or 5.67 feet higher than the elevation of defendant's railroad.

G. A. Kyle, the chief engineer of the Oregon Trunk Line, testified in this case that he did not consider a railroad constructed past the dam site, especially if a 60-foot dam is to be built there, would be safe at any less elevation than 70 feet. He accordingly raised the Oregon Trunk Line to that height above the river. He had examined the roadbed of the Deschutes Railroad Company at and above the dam site. He did not consider it would be safe to construct a dam at that point 60 feet in height with the railroad constructed as it is, unless they used a great deal of riprap on the present banks. If plenty of riprap was placed there, he thought the danger would be slight. Of course, it might cave out in a few places where the rocks are of volcanic ash—in fact, it is nearly all volcanic ash for a short distance, but that could be riprapped, he supposed, and made perfectly safe.

Mr. Boschke, the chief engineer of the defendant railroad, was asked:

"Q. Did Mr. Whistler (an engineer employed by the plaintiff to examine the lands in controversy as to their availability for power purposes) ever make any objection to you that your line wasn't high enough for the purposes for which his client wanted to use the property there? A. He spoke of the upper end, the way our grade lay, where the water came down, coming down the natural grade of the river, would reach the water. backed up from the dam; it would probably flood our grade in there. I said to him, *that part of it, we would readily change that when the time came; when he had a dam there, but I did not believe in spending any money to change that at this time.* * * *

"Q. How high a dam did you calculate could be built at the dam site without interfering with your road? A. I wasn't making any figures on the dam site at all, or the dam. I was building a railroad there, and building it as high as I could get up, starting at eight-tenths grade at the tunnel. I think a dam readily could be built there 60 feet or over without flooding our tract or right of way so as to interfere with our railroad, if the flood waters were properly taken care of."

In the course of the cross-examination of this witness concerning a previous affidavit made in the case, he was asked this question:

"Q. If the dam were constructed at the dam site only 60 feet in height, you have so built your railroad it would not affect your railroad at that place? A. No. I think it could be built there and protected, *inasmuch as we would have to do more riprapping at those places*, I mean.

"Q. In your affidavit you say a dam can be built there 50 feet in height, without affecting your railroad? A. Of course, it can. *That is only a nominal expense, a few thousand dollars to riprap those banks and make them safe, but we certainly wouldn't be spending that money now until there is a dam there to spend it for.*

"Q. Then I understand, Mr. Boschke, that in your judgment a dam can be built at the dam site 60 feet in height, and it wouldn't affect your railroad as now constructed at all? A. I think so."

The witness was asked:

"Q. Then how did you expect to protect your railroad at the dam site? A. * * * Build a retaining wall, or something like that. It is only a matter of a couple of feet there. It wouldn't be a hard job to keep out two feet of water."

[4] The conclusion we draw from this evidence is that the defendant, in accordance with the agreement or understanding had between the original parties and the subsequent acquiescence of the complainant, has constructed its railroad through complainant's lands upon a grade that will permit the complainant to build a dam approximately 60 feet in height above the low water in the river, but that this agreement or understanding had this further condition, that, upon the building of such a dam, it would be the duty of the defendant to protect its roadway by riprapping, or by building a retaining wall along the river side of the fills and embankments of its right of way, so as to protect the same from injury by the water to be stored in the river and reservoir above such dam. This condition necessarily implies a duty on the part of the complainant, in the building of its dam, to use every reasonable precaution by the construction of a spillway, or other engineering device, to carry off such high water as may come down the river in flood seasons.

[5] 4. The defendant interposes the further objection to complainant's proposed dam, that the defendant has acquired certain lands by purchase and the right of way over certain other lands above the lands owned by the complainant; that the plaintiff has acquired no right to raise the water of the river so as to flow upon any of the lands so acquired by the defendant, or back or over or upon its right of way, or to raise the waters of the river above its natural flow or above its natural fall.

It appears from the evidence that the fall of the river between the dam site and the south line of the northeast quarter of the southeast

quarter of section 9, township 4 south, range 14 east—the western limit of complainant's lands—is approximately 25 feet. If the complainant acquires no other lands on the river above the lands mentioned, this would be the limit of the plaintiff's right of reservoir or water storage and would correspondingly limit the height of the dam. But the statute of Oregon provides that persons, companies, and corporations having title or possessory right to the land, shall be entitled to the use and enjoyment of the water of any running stream within the state to furnish electrical power for any purposes, and may appropriate such waters, and shall have the right to condemn lands for certain uses, among others, for the sites of reservoirs for the storage of water for future use. Lord's Oregon Laws, §§ 6552, 6553. The complainant, having the right of eminent domain, has authority to acquire thereby whatever lands are necessary for its reservoir and water storage purposes, as and for a public use. See Grande Ronde Electrical Co. v. Drake, 46 Or. 243, 78 Pac. 1031; Walker v. Shasta Power Co., 160 Fed. 856, 87 C. C. A. 660, 19 L. R. A. (N. S.) 725; Henderson v. Lexington, 132 Ky. 390, 111 S. W. 318, 22 L. R. A. (N. S.) 136.

The fact that the project is not now fully completed will not prevent the complainant from exercising its right to condemn; the right to complete a project so far completed is the essential right to condemn land for that purpose. When the project, corresponding to a dam 60 feet in height, is so completed, the defendant will be subject to the same conditions with respect to its right of way through such lands as it has undertaken to perform with respect to the lands involved in this appeal.

[6] 5. The next objection to the decree comes from the defendant. The objection is that the court below treated the case as a condemnation suit and imposed the costs upon the defendant. The prayer of the defendant's answer was that, in case the court refused to dismiss complainant's bill, then it should determine the amount of damages sustained by the complainant, or to which complainant might be entitled by reason of the location and construction of defendant's line over and across said property. In other words, the defendant's answer was framed, in part, as a suit for equitable condemnation, and it was so treated by the court. The defendant made no tender and no offer to pay damages until after this suit was commenced. The costs were therefore properly imposed upon the defendant as the complainant in the condemnation suit.

6. The time has passed when a decree can be entered in this case based upon the conditions prevailing when the suit was commenced. The railroad has been built by the defendant and is now in operation through the lands involved in this appeal. The complainant acquiesced in the building of the road through its lands, upon the understanding and agreement had by the defendant with complainant's predecessors in interest concerning the proposed dam, 60 feet in height above ordinary low water in the Deschutes river where it flows through such lands. This agreement provided for the protection of this dam and its use for hydraulic purposes in connection with appliances for the development of hydraulic and electric power for all purposes. The de-

cree must therefore conform to the conditions prevailing when the decree was entered in the lower court.

The decree of the lower court is, accordingly, reversed, and the cause remanded, with directions to enter a decree: That the title to lands described as the north half of the southwest quarter (N. ½ of the S. W. ¼) of section 35, township 3 south, range 14 east, Willamette meridian, and lot 2 (N. W. ¼ of the N. E. ¼) of section 3, township 4 south, range 14 east, Willamette meridian, was acquired by the complainant prior to the right of way claimed by the defendant. That the defendant entered upon and has occupied its right of way over such lands upon the condition that it would not interfere with, or deprive the complainant or its successors in interest of, the right to construct and maintain a dam for hydraulic purposes in the Deschutes river where it passes through such lands, 60 feet in height above the ordinary low water in the Deschutes river, and the right to install, in connection therewith, appliances for the purpose of developing hydraulic and electric power for all purposes; the defendant to protect such power plant and the appliances connected therewith by taking care of its own right of way through such lands by riprapping or by building retaining walls along the river side of the fills and embankments of its right of way, so as to protect the same from injury by the water to be stored in the river and reservoir above such dam; the complainant, in building its dam, to use every reasonable precaution by the erection of a spillway or other engineering device to carry off such high water as may come down the river in flood seasons. Upon the foregoing consideration, and the payment by the defendant to the complainant of the nominal sum of one dollar, in accordance with the agreement between the parties, the complainant will execute and deliver to the defendant a good and sufficient deed for the right of way through the lands described, 200 feet in width, being 100 feet on each side of the center line of the railroad track.

The decree will further provide: That the title to lands described as the southeast quarter (S. E. ¼) of section 34, township 3 south, range 14 east, Willamette meridian, and southwest quarter of the northeast quarter (S. W. ¼ of the N. E. ¼), west half of the southeast quarter (W. ½ of the S. E. ¼), and east half of the southwest quarter (E. ½ of the S. W. ¼) of section 3, northwest quarter (N. W. ¼), and northwest quarter of the southwest quarter (N. W. ¼ of the S. W. ¼) of section 10, all in township 4 south, range 14 east, Willamette meridian, is in the complainant. That, in addition to the payment of $1,000 for the right of way through such lands, it shall be decreed, as a further consideration for such right of way, that the defendant shall not interfere with, or deprive the complainant or its successors in interest of, the right to construct and maintain a dam for hydraulic purposes in the Deschutes river where it passes through such lands, 60 feet in height above the ordinary low water in the Deschutes river, and the right to install, in connection therewith, appliances for the purpose of developing hydraulic and electric power for all purposes; the defendant to protect such power plant and the appliances connected therewith by taking care of its own right of way through such lands by riprapping or by building retaining walls along

the river side of the fills and embankments of its right of way, so as to protect the same from injury by the water to be stored in the river and reservoir above such dam; the complainant, in building its dam, to use every reasonable precaution by the erection of a spillway or other engineering device to carry off such high water as may come down the river in flood seasons. Upon the foregoing consideration, and the payment by the defendant to the complainant of the sum of $1,000, in accordance with the agreement between the parties, the complainant will execute and deliver to the defendant a good and sufficient deed to a right of way through the lands described, 100 feet in width, being 50 feet on each side of the center line of the railroad track.

The decree will further provide: That the title to lands described as lot 1 (N. E. ¼ of the N. E. ¼) of section 3, and the northeast quarter of the southeast quarter (N. E. ¼ of the S. E. ¼) of section 9, all in township 4 south, range 14 east, Willamette meridian, is in the complainant. That the defendant shall not interfere with, or deprive the complainant or its successors in interest of, the right to construct and maintain a dam for hydraulic purposes in the Deschutes river where it passes through such lands, 60 feet in height above the ordinary low water in the Deschutes river, and the right to install, in connection therewith, appliances for the purpose of developing hydraulic and electric power for all purposes; the defendant to protect such power plant and the appliances connected therewith by taking care of its own right of way through such lands by riprapping or by building retaining walls along the river side of the fills and embankments of its right of way, so as to protect the same from injury by the water to be stored in the river and reservoir above such dam; the complainant, in building its dam, to use every reasonable precaution by the erection of a spillway or other engineering device to carry off such high water as may come down the river in flood seasons. Upon the foregoing consideration, and the payment by the defendant to the complainant of the nominal sum of one dollar, in accordance with the agreement between the parties, the complainant will execute and deliver to the defendant a good and sufficient deed to the right of way through the lands described, 200 feet in width, being 100 feet on each side of the center line of railroad track.

When the complainant has completed its project by the acquisition of title to other lands above those to which it now has title, the defendant will be subject to the same conditions with respect to its right of way through such lands as it is now decreed to perform with respect to the lands involved in this appeal.

The costs on this appeal will be divided equally between the complainant and the defendant.

HUNT, Circuit Judge (concurring). The case is not the simple one where an owner, who, having stood silent observing that a railroad is being built upon his land, thereafter seeks to eject the railroad company or to enjoin the operation of the railroad as located. Were it such, I doubt not that the only remedy the owner has would be suit for damages in compensation. Rather is it an instance of where an owner who, after parleying upon the very point involved, the location

of the road with relation to the preservation of water power, and after he has had an understanding with the company that the location to be chosen would not prevent the owner from constructing and maintaining a dam 60 feet above ordinary low water in the river, that height being necessary for the proper development of the water power, has agreed that the company may go on and construct its road. I put the case in this way, because, upon a careful reading of the whole evidence, I cannot reach any other conclusion than that the parties to the several original talks, keeping in mind the essential things to be accomplished, meant to have it that the location of the railroad would be such that the development of the water power by a 60-foot dam would not be interfered with or impeded. I gather that it was a reciprocal arrangement made so that the railroad company would, on the one hand, obtain the full enjoyment of the valuable right of locating its proposed railroad over the lands involved, while, on the other hand, the landowner would be safe in the knowledge that in passing the right of way he would yet preserve the valuable right to use and develop his property for water power purposes by constructing a 60-foot dam. And if a decree can be made whereby the enjoyment of the one right can be held compatibly with the other, I think the courts will but be making effective the expressions and purposes of those who conferred upon the matter when it was fresh for adjustment. I therefore think that Judge MORROW has drawn the proper conclusions from the evidence.

With respect to the acquisition of the Sherar lands by lieu selection, my view is that by filing the lieu selection on February 13, 1906, Sherar acquired a right—it can be called an inchoate or initiatory right to enter the land—of sufficient strength and extent to avail him, not necessarily against all right of the United States to withdraw the lands from disposition, but of enough extent to protect his selections so that when his claim was examined and was not rejected for some error in the matter of the selection or fault in the proceedings incidental thereto and was held valid and regular, and the order of withdrawal was canceled, he was properly entitled to a patent to the land. Right of selection was suspended between the date of the order of withdrawal and cancellation of such order, but not killed. This being true, the patent though not issued to him until February, 1913, protected his selection as a lieu entryman with rights initiated and accrued in 1906 prior to the temporary withdrawal order also in 1906, against the subsequent and intervening application of the railroad company made in 1908 after the withdrawal order, for right of way across the land.

I think this conclusion finds support in the reasoning of the opinions in Spokane Falls, etc., Ry. Co. v. Ziegler, 167 U. S. 65, 74, 75, 17 Sup. Ct. 728, 42 L. Ed. 79; Weyerhauser v. Hoyt, 219 U. S. 380, 31 Sup. Ct. 300, 55 L. Ed. 258; and Daniels v. Wagner, 237 U. S. 547, 35 Sup. Ct. 740, 59 L. Ed. 1102, L. R. A. 1916A, 1116, Ann. Cas. 1917A, 40. As also bearing upon the construction of the Acts of March 3, 1875 (18 Stat. 482, c. 152 [Comp. St. 1916, §§ 4921–4926]), and February 15, 1901 (31 Stat. 790, c. 372 [Comp. St. 1916, § 4946]), see the opinion of Secretary of the Interior in 32 L. D. 597.

246 F.—27

GILBERT, Circuit Judge (dissenting). There is one proposition which I think is decisive of the whole question of this appeal. It is that the plaintiff and its predecessors in interest acquiesced in the construction of the road at the elevation at which it was built. The work of construction was begun in August, 1909, and it was continuously prosecuted until it was completed in the latter part of February, 1910. All the parties in interest knew that the work was being done. William McKenzie, one of plaintiff's agents, at Portland, testified that a profile of the road was submitted to him "along in August or September or October, 1909." In September, Whistler, an engineer, was employed by the plaintiff to examine the lands in controversy, and he reported to the plaintiff on October 6, 1909. In his report he referred to the fact that he had been instructed to take up with the two railroad companies "now building up the Deschutes Canyon the matter of their locations at Sherar Bridge power site." He stated that Boschke had turned over to him a blueprint of location and profile for some miles above and below the Sherar Bridge site, and he proceeded to say:

"Our levels in conjunction with the elevations shown on profile would indicate that their location is only about 60 feet above water surface, but it is not certain which datum the bench mark from which our levels run refers, and I doubt if absolute assurance can be gotten without sending a man to the site to determine. In either case, however, I am reasonably certain the railroad company would object seriously to raising their location. An .8 per cent. grade was used by the company in climbing over the United States Reclamation Service's dam site, and this has been adopted as their maximum grade. From their profile, it appears they have used this to climb over the Sherar site, and to go higher would require them to change their location, not only throughout the entire climb, but as much farther north as necessary to obtain the increased elevation by length of line."

Here was definite knowledge acquired by the plaintiff on October 6, 1909, that the road was being constructed probably not over 60 feet above the surface of the water. Boschke testified that:

Whistler "made no protest whatever as to the height at which our line was above the dam, in that vicinity. He never attempted to stop us from going ahead, or try to induce us to change our grade there."

No protest was ever made against the construction of the road at the altitude where it was placed by the plaintiff or its predecessors in interest until some time in March, 1910, and the objection which Martin, the plaintiff's president, made at that time, in his interview with Morrow, the right of way agent, was not that the railroad company had not carried out its agreements as to the altitude of its road above the dam site. The objection was confessedly inspired by a report which White & Co. had made recommending a dam 100 feet or more in height at the dam site. In his conversation with Morrow, Martin made no complaint that he could not construct a dam 60 feet in height. What he complained of was that he could not construct one very considerably higher than that. So in its first bill of complaint, which was filed on April 18, 1910, the plaintiff did not rely upon or plead an agreement which would permit the construction of a dam 60 feet high. In fact, it specifically denied that there had been any agreement at all, and its sole ground of complaint as alleged was that the road had been

placed at such a height that the plaintiff could not build a dam "exceeding 60 feet" in height. There never was a contention on the part of the plaintiff that there was an agreement or understanding that the road was to be so located as to permit the construction of a 60-foot dam at the dam site until the amended complaint was filed on November 12, 1913, about four years after the road was built. In that complaint the plaintiff made volte-face and alleged the things it had denied, and denied the things it had alleged in the original complaint. And even then the suit was not for the specific performance of an agreement or for damages for violation of an agreement, but it was a suit to obtain an injunction against maintaining or operating the railroad, and in the proofs in this case there is no testimony whatever that in purchasing the property the plaintiff relied upon or knew of any agreement between its predecessors in interest and the railroad company. In fact, Martin denied that there was such an agreement. He said:

"I ascertained that the people from whom we were buying the property had not in any way involved the property in any promises or agreements or deeds, or any act at all which involved the question of right of way. What remained to be settled, if we bought, was the question of whether the railroad had ever had any right to come on there at all or not."

To me it seems too plain to admit of discussion that the railroad company cannot now be made to change the location of its road, either to a greater elevation on its present line, which it seems is impracticable, or to remove it to a line further north where a workable higher grade might be found. There is but one remedy against a railroad company which has been permitted to go upon land and construct a line of road where the landowner has acquiesced in the construction of the road, and that is an action for damages.

"If a landowner, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with a statute requiring either payment by agreement or proceedings to condemn, remains inactive and permits it to go on and expend large sums in the work, he is estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and will be restricted to a suit for damages." Donohue v. El Paso & Southwestern R. Co., 214 U. S. 499, 29 Sup. Ct. 698, 53 L. Ed. 1060.

Where one stands by and silently sees a public railroad constructed upon his land, it is too late for him, after the road is completed or large sums have been expended on the faith of his apparent acquiescence, to eject the railroad company or enjoin the operation of the road as located. His only remedy is an action to recover compensation. Strickler v. Midland Ry. Co., 125 Ind. 412, 25 N. E. 455; Cowan v. Southern Ry. Co., 118 Ala. 554, 23 South. 754; Kakeldy v. Columbia, etc., R. Co., 37 Wash. 675, 80 Pac. 205; Slaght v. Northern Pacific R. Co., 39 Wash. 576, 81 Pac. 1062; Roberts v. Northern Pac. R. Co., 158 U. S. 1, 11, 15 Sup. Ct. 756, 39 L. Ed. 873; Goodin v. Cin. & Whitewater Canal Co., 18 Ohio St. 169, 98 Am. Dec. 95; Dulin v. Railroad Co. 73 W. Va. 166, 80 S. E. 145, L. R. A. 1916B, 653, Ann. Cas. 1916D, 1183; Edwards v. Roberts, 26 Colo. App. 538, 144 Pac. 856; Payne v. Railroad Co., 43 La. Ann. 981, 10 South. 10. Compensation, under the facts of the present case, would mean all the damages which the

plaintiff or its predecessors in interest, or either of them, could lawfully recover for injury to the power site, and on well-settled principles the plaintiff would be entitled to no damages at all, for it made no payment of money under the option for the Sherar lands until after December 1, 1909, and it did not acquire any land of the development company until August 2, 1910. The right to recover damages therefore remained in its grantors. Roberts v. Northern Pacific Ry. Co., 158 U. S. 1, 15 Sup. Ct. 756, 39 L. Ed. 873; Kindred v. Union Pacific R. Co., 225 U. S. 582, 32 Sup. Ct. 780, 56 L. Ed. 1216.

As to the lands acquired under the Sherar lieu selection, I think it is clear that the railroad company had acquired a valid right of way prior to the issuance of the patent, and that the patent properly granted the lands with an express reservation of the railroad company's rights. The lieu selection was filed on February 13, 1906. On April 26, 1906, while a contest was pending over the selection, it was ordered that certain lands, including the lands in controversy, "excepting any tracts title to which had passed out of the United States, should be temporarily withdrawn from any form of disposition whatever." This was done by the Secretary of the Interior for irrigation works under the Act of June 17, 1902, c. 1093, 32 Stat. 388 (Comp. St. 1916, §§ 4700–4708). On November 5, 1908, the railroad company adopted its line of definite location over the lands, and three days later filed its profile with the Register of the United States Land Office at The Dalles. On June 10, 1910, the profile was approved by the Secretary of the Interior. The withdrawal was not canceled until February 25, 1913, and on the same day patent was issued to the heirs of Sherar. The Act of March 3, 1899, c. 427, § 1, 30 Stat. 1233 (Comp. St. 1916, § 4945), provides as follows:

"That in the form provided by existing law, the Secretary of the Interior may file and approve surveys and plats of any right of way for a wagon road, railroad, or other highway over and across any forest reservation or reservoir site when in his judgment the public interests will not be injuriously affected thereby."

It is said in Judge MORROW'S opinion that the withdrawal was without avail as to these lands, for the reason that by virtue of the filing of the lieu selection the land, within the language of the withdrawal, was a tract to which, by the doctrine of relation, "title had passed out of the United States," and this is said to be the purport of the decision of the Supreme Court in Daniels v. Wagner, 237 U. S. 547, 35 Sup. Ct. 740, 59 L. Ed. 1102, L. R. A. 1916A, 1116, Ann. Cas. 1917A, 40. I submit that there is nothing in that case to sustain the proposition that title passes out of the United States upon the filing of a lieu selection. That decision goes no further than to hold that the entryman under a lieu land selection acquires a right to proceed and obtain title from the United States, and that, when his application is in proper form, the Land Office has no jurisdiction to reject it and sustain the later application of a contesting entryman. The right of an entryman on public land as against the United States is very different from his right as against another entryman. Certainly the right acquired by filing a lieu land selection is no greater than the right which is acquired by a pre-emption entryman upon government land. In both cases

the right acquired by the initial acts is the right to obtain title to the land. The courts have always held that the right of the pre-emption entryman before final payment is made and final receipt is given must yield to the right of the United States to withdraw the land. In Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668, it was held that the occupation and improvement of public lands with a view to pre-emption confer no vested right, but only a preference over others in the purchase of such lands, which right the land officers are bound to respect; but that this inchoate right is not valid against the United States, and that a vested right under the pre-emption laws is only obtained when the purchase money has been paid and the receipt of the proper land officer given to the purchaser. Until this is done the court held that it is within the legal and constitutional competency of Congress to withdraw the land from entry or sale. See, also, Yosemite Valley Case, 15 Wall. 77, 21 L. Ed. 82. A later expression of the doctrine is found in Russian-American Co. v. United States, 199 U. S. 570, 577, 26 Sup. Ct. 157, 159 (50 L. Ed. 314), where it is said:

"Such a vested right, under the pre-emption laws. is only obtained when the purchase money has been paid, and receipt from the proper land officer given to the purchaser. Until this is done, it is competent for Congress to withdraw the land from entry and sale, though this may defeat the inchoate right of the settler."

In Cosmos Co. v. Gray Eagle Co., 190 U. S. 301, 311, 23 Sup. Ct. 692, 696 (47 L. Ed. 1064), in determining the right acquired by the lieu land selector before approval of the selection and the acceptance of the deed, it was said:

"The ground upon which complainant insists that it is the equitable owner of the land selected is that it has relinquished a title in fee in a forest reservation, and has selected in lieu thereof vacant land open to settlement, and that the local land officers duly accepted, received, and filed the deed of the land relinquished, and the affidavit that the land selected was nonmineral, and that the officers duly entered such selection upon the official records of the land office, and then and there certified that the land selected was free from conflict, and that there was no adverse filing, entry, or claim thereto. Complainant asserts that was all that it could reasonably do; that nothing remained on its part to do; and that, when such is the case, the equitable title vests, and it is entitled to the protection of a court of equity to preserve and defend the title so acquired."

But the court said that "the mere filing of papers cannot create such title," and that "there must be a decision made somewhere regarding the rights asserted by the selector under the act before a complete equitable title to the land can exist." In short, it was held that the power to approve was judicial in its nature. The doctrine of that case is not overruled in Daniels v. Wagner; but, on the contrary, it is affirmed. Daniels v. Wagner holds that the Land Department committed error in law in assuming that it had a discretion to reject a lieu land selection which in all respects conformed to the statute. In other words, it is the doctrine of the decisions of the Supreme Court that by filing a lieu selection the selector does not acquire title, but only the right to obtain title, and that no interest vests in him until the officers of the Land Department shall pass judgment on the papers filed, accept his deed, and approve his selection, and that this is true, not-

withstanding that no discretion is vested in the Land Office to disapprove a selection and reject a conveyance in any case in which the papers are in proper form. This is recognized in the administrative ruling, 43 L. D. 293, that "no such right is acquired by a forest lieu, railroad, or state selector prior to approval thereof by the proper officer of the United States as will except the land from withdrawal by the government."

In brief, Congress has the power, and may vest it in the officers of the Land Department, to deprive one of his preferred right to acquire the title to public land, and confer it upon another, or devote the land to a public use, at any time before all the preliminary acts prescribed by law for the acquisition of title, including payment of fees, have been performed, so that it only remains to issue the patent. Before that time, the withdrawal of public lands suspends all rights of the entryman or the lieu land selector, and places the lands at the disposal of the government for any lawful purpose. One of the purposes for which it may be used is railroad building, and this is done by granting rights of way by statute across such reserved lands. The lieu land selector in this case had, under the terms of the reclamation act, the right to relinquish his filing and make "another and additional entry as though the entry thus relinquished had not been made." When he elects to stand by his entry, and the lands are again restored to public entry, and he acquires title, while he may be said to acquire it by relation as of the date of his selection, he nevertheless takes it subject to any burden which has been lawfully imposed thereon during the period of the withdrawal. The land so withdrawn in this case might lawfully have been devoted to reclamation works. In that event, the lieu selection would have been annulled.

Again, the evidence fails to show that there was an agreement that the line of road should be so located as to permit the construction of a dam 60 feet in height. The predecessors in interest of the plaintiff, with whom it alleges the agreement was made, are: (a) The Interior Development Company, (b) B. F. Franklin, and (c) the representatives of the Sherar estate. I turn to the consideration of the evidence as to each of these alleged parties to the agreement.

I. It is certain that there was no such an agreement with the development company.

Welch, who was president of the Interior Development Company, which company owned land where the dam site is situated until it turned its rights over to the plaintiff, was called as a witness for the plaintiff. He testified that in September, 1909, in company with Anderson of Tacoma, he went to the office of O'Brien, president of the Deschutes Railroad Company, to find out how high the railroad would be at the point of the dam site; that O'Brien took him to the office of Boschke, the engineer, and he was shown the maps. Welch testified:

"Then they asked about the right of way, and we told them that, if they would protect our filing, there would be no charges for the right of way. We specified the height of the dam as 60 feet, that we desired. The representative of the railroad company said that he had taken that into consideration. They showed us the maps of the railroad grades and heights, which showed, as I remember it, between 64 and 65 feet above low water. They had at that

time already raised their levels to that height before we made a request for it. * * * We decided that that height would satisfy us as far as the railroad was concerned. I mean the height allowing for a 60-foot dam.

"Q. When you went to the railroad company's office, they produced the profile showing the height of the proposed railroad at that place. Is that correct? A. Yes, sir. Q. And you expressed your satisfaction with that? A. Yes, sir; with the map. Q. And did you consider that that elevation would permit you to construct the dam in the manner in which you desired? A. We were satisfied we could construct a dam so we could get 60-foot fall. Q. And how had you in mind to construct the dam for that purpose? A. Well, we had in mind putting in some flood gates one way; and another one was with splash boards. Q. And that was practicable, you considered? A. We considered it was practicable, yes. * * * Q. And you so expressed your satisfaction to Mr. O'Brien and Mr. Boschke. Is that not correct? A. Yes, sir. Q. And advised them that they could go upon the land and construct on the elevation shown on that profile, and, if they did so that they could have the right of way free of charge, as far as the Interior Development Company was concerned? A. Yes, sir; that was the understanding. * * *

"Court: You thought you could construct a 60-foot dam without interfering with the railroad; is that what you thought? A. That was our opinion; yes, sir. Q. (Mr. Wilson) Who was interested in the Interior Development Company with you at that time? A. Mr. McCornack of Salem, E. P. Q. Did you and he own all the stock of the Interior Development Company? A. Yes, sir. Q. Was Mr. McCornack satisfied with that arrangement? A. Yes, sir."

Now, we have in this testimony the express agreement of the president and stockholders of the Interior Development Company that the railroad might be built at the elevation shown on its profile. The plaintiff in buying the property took it subject to that agreement, and was bound by it. The plaintiff, having called the witness, is bound by his testimony. There is no evidence which contradicts Welch's testimony. Anderson's testimony relates to the same conversation, and it in no way discredits or contradicts the testimony of Welch. Anderson was figuring with Welch on purchasing the land of the Sherar estate, for which Welch held an option. He was asked:

"Q. Now, at the time you were talking there, wasn't it understood you told O'Brien you wanted the road elevated? Didn't you say at that time, you and Welch, your people, that if he would elevate it to that height that that would be satisfactory to you, and that the railroad company could have the right of way free of charge if they would elevate it above to clear your 60-foot dam? A. I don't recall that. It may have been mentioned, and it may not. I would not deny or affirm that. I think I was there during the whole conversation. I don't recall any such conversation as that between Welch and O'Brien. I don't recall anything of the kind. I would not deny or affirm that. I don't recall it. I don't recall any conversation about right of way at that time."

It will be seen that Anderson did not deny or contradict the statement of Welch that he advised O'Brien and Boschke "that they could go upon the land and construct on the elevations shown on that profile." O'Brien corroborates the testimony of Welch. He testified that he pointed out to Welch what he proposed to do:

"That we had a line there that was along in the neighborhood of 60 or 62 feet, somewhere in about 60 feet, and told them that we had gone to a great deal of expense elevating our line, or we would go to a great deal of expense lifting our line to this height, and Mr. Welch said that was entirely satisfactory as far as they were concerned—Mr. Welch and Mr. Anderson. Mr. Welch said he would be very glad to donate the right of way free, if I went to that height."

There was no other witness who testified as to the agreement and understanding between the Interior Development Company and the railroad company. The evidence is clear that the development company assented to the construction of the road at the grade indicated on the profile, and on which grade it was constructed, and that it believed that it could construct its dam to a height of 60 feet without interfering with the railroad at that grade. That agreement so made is absolutely conclusive upon the parties to this litigation, so far as the lands purchased by the plaintiff from the development company are concerned. The plaintiff alleged in its second amended complaint that it was agreed between the development company and the railroad company that:

The latter "should have the right to go upon the lands owned by the Interior Development Company and the lands claimed by the Interior Development Company as above set forth, and construct its railroad over the same. * * * Provided that the railway line to be constructed over said lands by the defendant should be constructed at such an elevation above the water of the Deschutes river that the construction and maintenance of the defendant's railway line should not interfere with the construction and maintenance of a dam 60 feet in height above ordinary low water in said river."

In so alleging the agreement, the plaintiff set forth only a portion of it. The rest of the agreement, as shown by the undisputed testimony, was that the railroad might be constructed at the line indicated by its profile, which was exhibited to the development company, and that the development company in building its dam to the height of 60 feet would take care of its own flood waters. The only water right, or right to construct a dam to divert the waters of the Deschutes river, which the plaintiff has acquired, is that which attaches to the land of the development company, and which was acquired by that company by its notice of December 7, 1908.

2. There was no such agreement with Laughlin.

Laughlin was the holder of the option known as the Hostettler option, an option to purchase the Sherar lands. Under Laughlin's option the plaintiff acquired the Sherar property. It alleged in its amended complaint that, before it purchased the Hostettler option from Laughlin, it was agreed between Laughlin and the railway company that the latter might enter upon the lands described in the option, and locate and construct its railroad line over the same, provided that it should be so located, constructed, and maintained that a dam 60 feet in height above ordinary low-water mark in the Deschutes river might be constructed at any place on the lands described. That allegation of the complaint was not proven. The plaintiff called Laughlin as a witness, and he denied it. He testified that he had a conversation with O'Brien in March or February, 1909, in which O'Brien guaranteed to protect the Sherar property "to the fullest extent that it was possible"; that O'Brien called Boschke in and told him he would have to go back and rerun the line and save every foot of power for the Sherar property that could be saved. Laughlin testified:

"I don't think any height of dam was mentioned by me. I don't have any recollection about that. We had planned upon a 60-foot dam, 60 foot above mean low water. Q. Didn't you at that time agree that if they would elevate

their line to a level that would be 60 feet above low water, or permit the construction of a dam 60 feet high, that they might go ahead with their construction? A. No, sir; I did not. I said they could go ahead with their construction at that time, provided they paid for it, at any height; if they wanted to pay for all the property, they could go on water grade. Q. In your conference with Mr. O'Brien and Mr. Boschke in the Wells-Fargo building, you stated to them that it would be satisfactory to you, and to the people you represented, for the railroad company to proceed and build on a right of way that would enable and permit the construction of a 60-foot dam, and that if they would do that and raise the line to that elevation that you would see that the Deschutes Railroad Company would be given the right of way for a nominal consideration? A. I did not. I had no talk with them, or either of them, to that effect. Q. Now, in your conversation over the phone, didn't you have an understanding with Mr. Morrow that they could proceed with construction across this property if that elevation was maintained by the railroad sufficient to go over a dam 60 feet high? A. I did not, at no time, or at no place, nor in the presence of anybody at all. I think Mr. Morrow was present at the conference I had with Mr. O'Brien and Mr. Boschke in February or March, 1909. Q. Now, at that time and place, didn't you say to Mr. O'Brien and Mr. Boschke and Mr. Morrow that, if they would raise the grade as high as they could, you would be satisfied, and Mr. Boschke, the chief engineer, referred to his profile maps, and stated that it was possible for him to reach a height so as to clear a 60-foot dam? A. I did not. The matter was not mentioned, any particular number of feet."

The plaintiff having alleged the agreement as it did, and having made Laughlin its witness to prove it, is it not bound by the testimony which he gave? Let us see what other evidence there is to show that Laughlin's testimony should not be accepted as conclusive. The other persons present at the interview were O'Brien, Boschke, and Morrow. O'Brien's testimony was that:

He "asked Mr. Boschke in a general way if he had any idea, or if he could get any idea from the data he had in his possession at that time, as to how high he could go without making the cost prohibitive," and he said "in the neighborhood of 58 or 60 feet, along in there. I asked Mr. Laughlin if that would be satisfactory at that height, along in there, between 58 and 60 feet. Mr. Laughlin said he thought that would be satisfactory. * * * It was simply a question of how far we could get up in order to give him the additional height, in order to develop his power. It was thoroughly understood that the whole question depended, from my standpoint, on the question of how much money we could afford to spend there, without making the line so expensive that we would have to give it up. Q. And you did that, did you, to satisfy Mr. Laughlin in connection with your understanding there with him? A. I suppose that I had. Mr. Laughlin expressed himself as well pleased with what we had done, the instructions that I had issued to Mr. Boschke. And, as I said before, when I asked Mr. Boschke about how high he could go, if he could give an opinion as to how high he could go, or how high he thought he could go, on the data on hand, he said between 55 and 60 feet; and Mr. Laughlin seemed to be well pleased with that."

Boschke testified:

"I indicated approximately what elevation we could make at the dam site, at that conference. I knew we could get up some number of feet, and Laughlin said anything we could get up there would be very desirable. I don't remember exactly the height I thought we could make. It was 45 or 50 feet, perhaps 60. I don't remember, but the whole thing hinged on starting out on a maximum grade, and getting as high as we could. That is what my instructions were to do. Q. Did Mr. Laughlin express satisfaction or dissatisfaction with the approximate height that you indicated? A. Well, as I said, at

this conference he said that every foot we could get up there would be very desirable, and agreeable to them, whatever we could do."

Morrow testified that:

"He (Laughlin) was wanting to know about the elevation there, and really expressed himself as being satisfied with any elevation that we might reach. There was more or less discussion, and Mr. Boschke referred to his profile. and my understanding is, and I think it is true, that he said he could probably reach an elevation of 60 feet. Anyway, whatever that elevation was, Mr. Laughlin expressed himself as being perfectly satisfied with it."

There was no other testimony as to the agreement with Laughlin.

3. There was no such agreement with the representatives of the Sherar estate.

Those representatives were the two executors. Only one of them, Grimes, was called as a witness. His testimony is as follows:

"Q. You didn't have any negotiations at all in regard to a dam site there with the railroad company? A. Not any more than they were notified, that is, in our talk with Mr. Morrow, that if we gave them a right of way through there, they would have to keep high enough to protect the dam site. Q. How high a dam site would they have to protect? A. I had nothing to do about the figures that the dam site was to be, what height they were to keep. It was supposed to be from 60 to 65 feet, my understanding was. Q. Wasn't it 55 feet you were talking about? A. No, sir; I don't think so. I never heard of any 55 feet. Q. What did Mr. Morrow say about keeping up there to protect the dam site? A. I have no recollection of his making any reply whatever."

That is the whole of Grimes' testimony on the subject, and it is clear that his understanding was that the railroad was to be at an elevation of from 60 to 65 feet at the dam site. That understanding was carried out.

It thus appears by the testimony of the president of the development company, by that of Laughlin, and by that of the executor of the Sherar estate, all of whom were called as witnesses for the plaintiff, that there was no agreement on their part with the railroad company, such as is alleged in the plaintiff's complaint.

The testimony on which a contrary conclusion is reached is that of Anderson and Morrow. I have already discussed the testimony of Anderson, and shown that his testimony related only to the interview with Welch, the president of the development company, and that it is entirely in harmony with Welch's testimony. Morrow, it is true, testified, "It was agreed that the elevation of the line should be such that a dam 60 feet in height above low-water mark should be constructed," and this is quoted in Judge Morrow's opinion. But what Morrow so testified to is to be taken in connection with the other portions of his testimony, and, when so considered, all the circumstances indicate that the dam 60 feet in height which he contemplated, and to which he alluded, was a dam 60 feet in height such as Welch said he could erect at the dam site, when he said: "We had in mind putting in some flood gates one way; and another one was with splash boards." If the affidavits which Morrow and Boschke filed in 1910 are relied upon as impeaching the testimony they gave on the trial, I wish to say first, as to Morrow's affidavit, in which he stated that the chief

engineer, by reference to his profiles and maps, stated that it was possible to reach a height so that a dam 60 feet in height could be constructed, and this was agreed to on the part of Mr. Laughlin to be sufficient, Morrow explained that and stated that he believed the affidavit was erroneous, but he admitted that he had the understanding that it was possible to construct a dam of the height of 60 feet, and it seems to have been the understanding of all parties, in the few conversations in which the height of the dam in connection with the location of the grade at the point where the road was built was mentioned, that a dam 60 feet in height could be constructed in the manner in which Welch proposed to construct it. Such a dam, it is admitted, would not interfere with the railroad as constructed. So Boschke in his affidavit had stated that "if the height of the line of the Deschutes Railroad Company were raised to the height of 60 feet, or raised to a height to permit of a 60-foot dam at this dam site, it would be satisfactory." But in explaining his affidavit he said that "Laughlin stated that any height would be satisfactory that we could get up to." I submit that there is substantially no conflict in the testimony, and, if there were, it would be a case for the application of the rule that the finding of the trial judge on conflicting testimony will not be disturbed on appeal.